IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

WELSCO, INC.                                                              PLAINTIFF

v.                                          Case No. 4:12-cv-00394-KGB

MIKE BRACE                                                               DEFENDANT

## OPINION AND ORDER

This case involves the alleged breach of a covenant not to compete. Welsco, Inc. ("Welsco"), filed its Complaint and Petition for Declaratory Relief in the Circuit Court of Pulaski County, Arkansas on June 1, 2012 (Dkt. No. 4). On June 4, 2012, Welsco moved in state court for a preliminary injunction and requested an expedited hearing (Dkt. Nos. 5-6). Before the state court held a hearing on the motion for a preliminary injunction, defendant Mike Brace removed the case to this Court (Dkt. No. 1). This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332 by virtue of the diversity of citizenship of the parties and the amount of the matter in controversy.

Welsco's Motion for Preliminary Injunction (Dkt. No. 5) is currently pending before the Court. Mr. Brace has responded in opposition (Dkt. No. 28). The Court conducted a hearing on the motion on August 23, 2012. At the hearing the Court requested that the parties file supplemental briefs relating to the choice-of-law issues in this case. In compliance with that request, Welsco filed a reply brief (Dkt. No. 30), and Mr. Brace filed a sur-reply (Dkt. No. 32).

### I.    Factual Background

Mr. Brace, who currently is a citizen of Oklahoma, is a former manager of Welsco, which is an Arkansas corporation with its principal place of business in Arkansas. Mr. Brace was employed by Welsco from March 15, 2005 through April 30, 2012 as the manager of Welsco's

Tulsa, Oklahoma store.  Mr. Brace resigned April 30, 2012, and began to work for Gas & Supply, a competitor of Welsco.

Sometime before March 15, 2005 and before Mr. Brace became an Oklahoma resident, he interviewed for employment with Welsco at the company's Arkansas headquarters.  The parties agree that Mr. Brace accepted employment with Welsco after the Arkansas interview, relocated to Tulsa, Oklahoma, and, at some point in March 2005, received from Welsco through the mail a noncompete agreement addressed to Mr. Brace in Tulsa.  Welsco maintains that, as a matter of course, Welsco discusses noncompete agreements in interviews prior to hiring employees. Welsco requires salespeople to sign noncompete agreements as a condition of employment.  At the preliminary injunction hearing, however, Chris Layton, a vice president for sales of Welsco, could not specifically recall having had a conversation with Mr. Brace about the noncompete agreement during Mr. Brace's interview in Arkansas.  Mr. Brace asserts that a noncompete agreement was not discussed during his interview in Arkansas.  He claims he received the noncompete agreement in the mail from Welsco without any prior discussion.    All parties admit Mr. Brace executed the noncompete agreement in Oklahoma and returned it to Welsco in Arkansas, without questioning or negotiating with Welsco any of its terms.  According to Mr. Brace, however, he sought the advice of an attorney in Oklahoma before singing the noncompete agreement.  Given the sequence of these events and Mr. Brace's overall demeanor on the witness stand while responding to questions posed by Welsco's lawyer and his own, the Court does not find credible Mr. Brace's testimony that he was unaware of the noncompete agreement before signing it in Oklahoma.

In the course of his employment with Welsco, Mr. Brace received training in Arkansas regarding the welding and industrial gas supply business.  Mr. Brace attempts to downplay the

significance of that training, but even Mr. Brace admits he traveled to Arkansas at least four times per year for management meetings. Over the course of his employment with Welsco, Mr. Brace traveled to Arkansas over 40 times.

In his role as a Welsco manager, Mr. Brace solicited existing and prospective clients on Welsco's behalf. He also was involved in marketing, strategic planning, and company operations. Because of his position, Mr. Brace had access to detailed confidential information regarding Welsco clients, clients' needs, company finances, cost information, product specifications, and the like. Welsco asserts that Mr. Brace developed relationships with Welsco's clients and vendors that he would not have developed but for his employment with Welsco. The parties agree that Mr. Brace's sales were concentrated largely in Tulsa County, Oklahoma and the surrounding counties and that a large majority of Mr. Brace's sales came from the Local 798 pipefitters and welders union ("the 798 union"), which is based in Tulsa, Oklahoma. Welsco estimated that over 90 percent of Mr. Brace's sales came from selling Welsco's products to the union's training center and to the union's individual members.

The parties do not dispute that even though Welsco, through its then-salesman Mr. Brace, sold products to the individual members of the 798 union, Welsco essentially considered the customer to be the 798 union, not the individual members. In fact, during the period of Mr. Brace's employment with Welsco, Welsco did not track individual sales to members of the 798 union by individual name. Instead, it recorded the sale or sales to "the 798 union." Mr. Brace did not present evidence to the contrary.

When members of the 798 union needed new equipment, they would often approach a man named Roger Hobrock, who works for Miller Electric and has an office in the 798 union hall. Miller Electric apparently does not sell products comparable to Welsco's or Gas &

Supply's products directly to the public.  Therefore, Mr. Hobrock would pass individual 798 union member's orders to Welsco through Mr. Brace.  There was testimony that sales through the 798 union had steadily increased during the period of Mr. Brace's employment with Welsco. There was some evidence that Mr. Brace knew Mr. Hobrock prior to Mr. Brace's employment with Welsco, but this evidence was not developed in the record sufficiently for this Court to make a determination regarding whether Mr. Brace brought this business to Welsco.  Instead, it seems Welsco and Mr. Brace developed business with the 798 union and Mr. Hobrock during Mr. Brace's seven-year employment with Welsco.

Mr. Layton testified at the hearing that Welsco would be unable to calculate its damages in this case.  This was contrary to his deposition testimony; he testified during his deposition that Welsco could calculate its damages.  He explained at the hearing that, after reflection, he changed his mind and determined that it would be difficult to calculate damages.  He cited potential market changes and uncertainty in predicting how Welsco sales might have fared had Mr. Brace not departed as reasons why the calculation would be difficult.

Welsco asserts that, in the first quarter of 2012, the 798 union accounted for $159,000 in sales.  Since Mr. Brace's departure, Welsco has done very little business through the 798 union. Welsco asserts that it has done approximately $400 in sales through the 798 union since Mr. Brace's resignation.  According to Welsco, at the time of his departure, Mr. Brace was averaging $60,000 per month in sales through the 798 union.  Welsco contends that, when Mr. Brace began to work for Gas & Supply, he continued to sell welding and industrial gas equipment to customers who formerly purchased such equipment from Welsco, including members of the 798 union.  The testimony from witnesses established that Mr. Brace now has a desk within a few

feet of Mr. Hobrock and that Mr. Hobrock continues to pass individual 798 union member's orders to Mr. Brace, which benefits his new employer Gas & Supply.

Welsco also asserts that Mr. Brace offered jobs at Gas & Supply to two Welsco employees who Gas & Supply asked Mr. Brace to target with offers of employment.  The parties do not seem to dispute this but also acknowledge that neither of those employees resigned from Welsco as of the time of the hearing.  Welsco also asserts that Mr. Brace received from Welsco within months of his resignation confidential company information that he should have returned to Welsco after reviewing and commenting on it.  Welsco did not receive that information back from Mr. Brace, and Mr. Brace testified he has no recollection what he did with the information.

Welsco asserts that Mr. Brace, on behalf of Gas & Supply, has engaged in soliciting and procuring business from Welsco's clients with whom he did business and thus has violated his noncompete agreement with Welsco.

### II.    Choice of Law

Before the Court can address whether the noncompete is enforceable or whether Welsco is entitled to a preliminary injunction, the Court must decide whether Arkansas or Oklahoma substantive law applies to this case.   In determining a choice-of-law issue in a diversity action, a federal court looks to the choice-of-law principles of the forum state.  *Simpson v. Liberty Mut. Ins. Co.*, 28 F.3d 763, 764 (8th Cir. 1994).  Thus, Arkansas's choice-of-law principles govern whether Arkansas or Oklahoma law applies to this noncompete agreement.

In *Heating & Air Specialists, Inc. v. Jones*, the Eighth Circuit Court of Appeals applying Arkansas law discussed in detail "contract actions raising conflict of laws issues."  180 F.3d 923, 928 (8th Cir. 1999).  The court correctly noted that "Arkansas courts have developed two apparently separate and opposing lines of cases."  *Id.*  The court first discussed *Cooper v.*

*Cherokee Village Development Co.*, 236 Ark. 37, 44, 364 S.W.2d 158, 161-62 (1963), in which the Arkansas Supreme Court "considered only the state of contract execution, the state of performance, and the parties explicit choice of law" in deciding which state's substantive law applied. *Jones*, 180 F.3d at 928. The Eighth Circuit concluded that "the *Cooper* court explicitly refused to adopt" the most significant contacts test, which is also known as the "center of gravity" approach. *Id.* In *Cooper*, the Arkansas Supreme Court observed it "has consistently inclined toward applying the law of the state that will make the contract valid, rather than void." 236 Ark. at 44, 364 S.W.2d at 162.

However, "[w]ith no discussion of *Cooper* or the test established therein, the Arkansas Supreme Court reversed its position in *Standard Leasing Corp. v. Schmidt Aviation, Inc.*, [264 Ark. 851, 576 S.W.2d 181, 184 (1979)], applying the center of gravity approach to determine the choice of law governing a multi-state contract." *Jones*, 180 F.3d at 928. In *Standard Leasing*, the Arkansas Supreme Court applied Arkansas law, despite the fact that the contract "contained a choice of law clause dictating a different result." *Jones*, 180 F.3d at 928 (citing *Standard Leasing*, 264 Ark. at 855, 576 S.W.2d at 184.

The Eighth Circuit noted that "Arkansas Supreme Court cases following *Standard Leasing* have vacillated between the *Cooper* and *Standard Leasing* approaches, generally citing one case without referencing the other." *Jones*, 180 F.3d at 928. After reviewing a number of Arkansas cases addressing this issue, the court determined, "[t]hese cases have adhered to a growing trend in the most recent Arkansas decisions of applying the *Standard Leasing* significant contacts test only when the contract at issue contains no explicit choice of law provision." *Jones*, 180 F.3d at 929. The court observed that "[a]lthough a strict rule applying *Standard Leasing* to all contracts without choice of law provisions and *Cooper* to all contracts

with choice of law provisions may not be appropriate in every case, this principle reflects generally the most recent decisions in this Court and in the Arkansas Supreme Court." *Jones*, 180 F.3d at 929 (footnote omitted).

In cases decided by the Eighth Circuit and this Court since *Jones*, courts have applied the *Standard Leasing* significant contacts test to contracts without choice-of-law provisions.  In *Fuller v. Hartford Life Ins. Co.*, the Eighth Circuit, citing *Jones*, concluded that the "most significant relationship test" applied to a common carrier travel insurance contract that did not contain a choice-of-law provision.  281 F.3d 704, 706-07 (8th Cir. 2002).  This Court also has applied the most significant relationship test when there was "an ineffective choice of law by the parties" because of conflicting choice-of-law provisions.  *Coorstek, Inc. v. Electric Melting Servs. Co.*, No. 4:06-cv-1726-JMM, 2008 WL 160620 (E.D. Ark. Jan. 15, 2008).  *See also Riceland Foods, Inc. v. Liberty Mut. Ins. Co.*, No. 4:10-cv-91-SWW, 2010 U.S. Dist. LEXIS 80010, at *4-5 (E.D. Ark. Aug. 6, 2010) (quoting *Crisler v. Unum Ins. Co. of America*, 366 Ark. 130, 133, 233 S.W.3d 658, 660 (2006)) (applying the most significant contacts test when an insurance contract contained no choice-of-law provision).  There is no choice-of-law provision in the noncompete agreement between Welsco and Mr. Brace.  Therefore, the Court will follow the trend in Arkansas state and federal cases and apply the *Standard Leasing* significant contacts test when determining the choice-of-law issue in this case.

Turning then to the test itself, "'[i]n cases not involving an effective choice of law by the parties, the following factors are relevant to the determination of which state has the most significant relationship to a particular case:  (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location and subject matter of the contract; [and] (5) domicile, residence, nationality, place of incorporation and place of

business of the parties.'" *Riceland Foods*, 2010 U.S. Dist. LEXIS 80010, at *4-5 (quoting *Crisler*, 366 Ark. at 133, 233 S.W.3d at 660 (2006)). In *Jones*, the Eighth Circuit explained that "[t]he state where the parties initiate and conduct negotiations weighs heavily in Arkansas courts' principal contacts analysis." 180 F.3d at 930. The Eighth Circuit also recognized that "[s]everal Arkansas cases suggest that the center of gravity approach is unhelpful and thus inappropriate, even when no choice of law clause exists, when neither state has substantially greater contacts than the other with the parties' transactions." *Id.* at 929 n.5 (citing *Yarbrough v. Prentice Lee Tractor Co.*, 252 Ark. 349, 479 S.W.2d 549 (1972); *Grogg v. Colley Home Ctr., Inc.*, 283 Ark. 120, 671 S.W.2d 733 (1984); *Stacy v. St. Charles Custom Kitchens of Memphis, Inc.*, 284 Ark. 441, 683 S.W.2d 225 (1985)). In those cases—when neither state's contacts are substantially greater—Arkansas courts "have fallen back on the principle established in *Cooper*, that the law of the state that would uphold the validity of the contract applies." *Id.*

Applying the five factors to the present case, the Court concludes that neither Arkansas nor Oklahoma have a more significant relationship than the other to this case. First, as to the place of contracting, there is a factual dispute. Applying these factors produces a mixed result. Welsco asserts that it always discusses noncompete agreements at the initial interview, which would have taken place before Mr. Brace was even a resident of Oklahoma. Welsco further asserts that it would have been made clear to Mr. Brace at his interview in Arkansas before he accepted a position with Welsco that signing the noncompete agreement was a condition of his employment. In fact, the consideration for the noncompete agreement as stated in the agreement is "continued employment." The parties do not dispute, however, that Mr. Brace signed the contract in Oklahoma. Welsco asserts that the only aspect of contracting that took place in Oklahoma was Mr. Brace "signing on the dotted line." Mr. Brace, while in Oklahoma, did not

attempt to negotiate or call into question any of the terms of the noncompete agreement. According to Mr. Brace, however, he sought the advice of an attorney in Oklahoma before singing the noncompete agreement. Overall, considering all of the evidence presented, the Court finds that this factor weighs slightly in favor of applying Arkansas law.

As for the second factor, there was little negotiation involved in forming this noncompete agreement. There is a factual dispute regarding whether and to what extent the noncompete agreement was discussed in Mr. Brace's initial interview in Arkansas. Welsco presented testimony that the noncompete agreement was the *sine qua non* of Mr. Brace's employment. Although Mr. Brace testified that he does not recall discussing the noncompete agreement in his interview, as explained, the Court does not find his testimony to be credible in this regard. Moreover, there has been no evidence that any negotiation took place in Oklahoma; as to this, both parties agree. Accordingly, any negotiation that took place in this case occurred in Arkansas where the parties agree Mr. Brace was interviewed. The Court determines that this factor weighs in favor of the Court applying Arkansas law.

In regard to the third factor, the place of performance of the contract is not definitely set in Arkansas or Oklahoma. The noncompete agreement does not so much contemplate performance as much as it prohibits certain activities post-employment. The parties do not dispute that, while he worked for Welsco, Mr. Brace lived in Oklahoma and that most of his clients were located in Oklahoma. The competition prohibited by the noncompete agreement would largely bar Mr. Brace from engaging in certain competition in Oklahoma—specifically Tulsa and surrounding counties—with Oklahoma customers. On the other hand, there is evidence that nearly every order was processed through Welsco's headquarters in Arkansas, including those orders obtained by Mr. Brace, and that Mr. Brace was required to submit

frequent reports to Welsco's Arkansas headquarters.   The Arkansas headquarters handled invoicing and billing.  Product was shipped from its location, which in some cases was neither Arkansas nor Oklahoma, so this factor is neutral.  In sum, this factor weighs in favor of this Court applying Oklahoma law.

The fourth factor requires the Court to consider the location and subject matter of the contract, which, in the Court's view, are two related but distinct analyses.  The location of the contract is not set in any one place.  Rather, the noncompete agreement bars certain activity where Mr. Brace worked for Welsco.  As noted above, the noncompete agreement largely restrains Mr. Brace in Oklahoma.  On the other hand, Welsco is an Arkansas business, and the competition barred by the noncompete agreement directly affects an Arkansas company.  On balance, the location of the contract weighs slightly in favor of the Court's applying Oklahoma law.  As for the subject matter of the contract, the analysis is neutral.  The non-compete agreement certainly purports to bar Mr. Brace from competing with Welsco in the counties in which Mr. Brace worked for Welsco.  The customers covered by the non-compete agreement include those "whom or which he had dealt with on behalf of [Welsco]."  The majority of those customers are in Oklahoma.  However, customer databases and records were largely maintained in Arkansas, and business operating procedures were developed and maintained at the company's headquarters in Arkansas as evidenced by the purportedly confidential document Welsco sent to Mr. Brace for review and comment before returning it to the company in Arkansas.  The subject matter of the noncompete agreement is confidential information, and here that is split between Arkansas and Oklahoma.  Overall, the two parts of this factor, considered together, weigh slightly in favor of this Court's applying Oklahoma law.

As for the fifth factor, it is undisputed that Mr. Brace is an Oklahoma resident. Contrary to Welsco's arguments, Mr. Brace's frequent business trips to Arkansas are not dispositive here because this factor requires the Court to look at Mr. Brace's domicile, residence, and nationality. As for Welsco, it is an Arkansas corporation with its principal place of business in Arkansas. Welsco, however, has a place of business in Oklahoma, which the Court is required to consider. For this reason, this factor is not completely neutral. It weighs slightly in favor of this Court's applying Oklahoma law.

Overall, the most significant contacts test does not definitively require the Court to apply Arkansas or Oklahoma law. The score is too close for the Court to conclude that one state has *substantially* greater contacts than the other. For that reason, the Court is convinced that the tiebreaker is the principle that the Court should select "the law of the state that would uphold the validity of the contract." *Jones*, 180 at 929 n.5. The Court need not find a mathematically precise tie in the factors to invoke that principle because, as recognized in *Jones*, Arkansas courts have fallen back on that principle when neither state has "*substantially* greater contacts than the other." *See Jones*, 180 F.3d at 929 n.5. Because Welsco has conceded that the noncompete is unenforceable under Oklahoma law and because the Court finds that neither Arkansas nor Oklahoma has substantially greater contacts than the other, the Court will apply Arkansas substantive law to determine whether the noncompete agreement is enforceable.

## III.    Enforceability of the Noncompete Agreement Under Arkansas Law

Because the Court's choice-of-law analysis involves applying the state's law that will uphold the contract, the Court will examine the enforceability of the noncompete agreement under Arkansas law. In Arkansas, as in other jurisdictions, "[c]ovenants not to compete are not looked upon with favor by the law." *Duffner v. Alberty*, 19 Ark. App. 137, 139, 718 S.W.2d

111, 112 (1986).   "The enforceability of a covenant not to compete depends upon its reasonableness in light of the particular facts of the case." *Rebsamen Ins. v. Milton*, 269 Ark. 737, 742, 600 S.W.2d 441, 443 (1980).   Reasonableness is an "ad hoc" determination.   *Id.*   In determining reasonableness, a court must examine whether the noncompete agreement "is only broad enough to afford a fair protection to the interest of the party in whose favor it is given and not so large as to interfere with the interests of the public." *Freeman v. Brown Hiller, Inc.*, 102 Ark. App. 76, 81, 281 S.W.3d 749, 754 (2008).

"Generally, the employer must meet these three requirements: (1) the employer has a valid interest to protect; (2) the geographic restriction is not overly broad; and (3) a reasonable time limit is given." *Id.* at 743, 600 S.W.2d at 443-44.   That said, "the party challenging the validity of a covenant not to compete has the burden to show that it is unreasonable." *Sensabaugh v. Farmers Ins. Exch.*, 420 F. Supp. 2d 980, 985 (E.D. Ark. 2006) (applying Arkansas substantive law).   Noncompete agreements "in employment contracts are subject to stricter scrutiny than those connected with the sale of a business." *HHR Ark., Inc. v. River City Contrs.*, 350 Ark. 420, 430, 87 S.W.3d 232, 239 (2002).   Finally, a noncompete agreement is not enforceable if it prohibits ordinary competition, because "the law does not provide protection against ordinary competition." *Import Motors, Inc. v. Luker*, 268 Ark. 1045, 1050-51, 599 S.W.2d 398, 401.

Although noncompete agreements are disfavored by the law, Arkansas courts have routinely enforced them.   For example, in *Freeman*, the Arkansas Court of Appeals upheld the validity of a noncompete agreement that barred a former insurance agent from directly or indirectly soliciting or attempting to solicit business from the former employer's clients.   102 Ark. App. at 78, 281 S.W.3d at 752.   The trial court granted a preliminary injunction, "finding

that [the former employer] had a protectable interest in its stock of customers . . . ." *Id.* at 79, 281 S.W.3d at 753.  Notably, the noncompete agreement did not contain an explicit geographic scope.  *Id.*  In affirming the trial court, the Arkansas Court of Appeals stated that "the single most important asset of most businesses is their stock of customers and that protection of that asset is a legitimate interest." *Id.* at 82, 281 S.W3d at 755 (citing *Girard v. Rebsamen Ins. Co.*, 14 Ark. App. 154, 685 S.W.2d 526 (1985)); *see also Sensabaug*h, 420 F. Supp. 2d at 986 ("A covenant that seeks to prevent unfair competition by a former agent who has built up personal relationships with the customers must be narrowly tailored to apply only to the customer base that the covenantee has a legitimate interest in protecting.").  The *Freeman* court went on to explain that "an employer is especially vulnerable to losing customers when his employee deals with customers away from the business and builds up personal relationships that bind the customers to him." *Freeman*, 102 Ark. App. at 82, 281 S.W.3d at 755.

In the case at bar, the noncompete agreement is valid and enforceable under Arkansas law.  Welsco primarily seeks to protect its "lists of customers, their needs and requirements, and business methods" (Dkt. No. 5, at 4).  The noncompete agreement purports to prevent Mr. Brace from being able to "solicit or procure any of [Welsco's] customers whom or which he had dealt with on behalf of [Welsco] in an effort to obtain or retain their business other than on behalf of [Welsco]" for a period of one year following the end of his employment with Welsco (Dkt. No. 5, at 4).  The noncompete agreement is restricted to "the counties in which employee has engaged in business activities for [Welsco], during the last six (6) months" (Dkt. No. 5, at 4). Welsco has a valid interest to protect.  Arkansas law is settled that customer lists, which include those customers' needs and requirements, constitute a valid interest to protect through a noncompete agreement. *See Freeman*, 102 Ark. App. at 82, 281 S.W.3d at 755.

The geographic restriction is not overly broad.  The Arkansas Court of Appeals has stated that "[t]he geographic area in a covenant not to compete must be limited to be enforceable." *Jaraki v. Cardiology Assocs. of Northeast Ark.*, 75 Ark. App. 198, 206-07, 55 S.W.3d 799, 804 (2001).  "In determining whether the geographic area is reasonable, the trade area of the former employer is viewed.  *Where a geographic restriction is greater than the trade area, the restriction is too broad and the covenant not to compete is void*."  *Id.* at 207, 55 S.W.3d at 804 (emphasis added).  Here, the noncompete agreement bars competition only in the counties in which Mr. Brace did business for Welsco in the last six months of his employment.  This is clearly less than Welsco's entire trade area.  *Cf. id.* (finding that the noncompete agreement was invalid because, *inter alia*, the geographic restriction was too broad because it included Memphis, Tennesee, which was not a part of the former employer's business base).  The testimony at the hearing indicated that this would include Tulsa County and several surrounding counties.  This is a reasonable geographic restriction.

The one-year time limit also is reasonable.  *See Sensabaug*h, 420 F. Supp. 2d at 986 (citing *Orkin Exterminating Co. v. Murrell*, 212 Ark. 449, 458, 206 S.W.2d 185, 190 (1947); *Farmers Ins. Exch. v. Sorenson*, 99 F. Supp. 2d 1000, 1006 (E.D. Wis. 2000); *Statco Wireless, LLC v. Southwestern Bell Wireless, LLC*, 80 Ark. App. 284, 299, 95 S.W.3d 13, 21-22 (2003)).

Further, the Court is convinced that the principle that "an employer is especially vulnerable to losing customers when his employee deals with customers away from the business and builds up personal relationships that bind the customers to him" applies in this case. *Freeman*, 102 Ark. App. at 82, 281 S.W3d at 755.  Mr. Brace dealt with customers on behalf of Welsco a significant distance away from the company's Arkansas headquarters.  The parties do not dispute that Mr. Brace built up important personal relationships with those customers during

his Welsco employment.  This also bears on the ad hoc reasonableness determination that the Court is required to undertake when deciding the validity of a noncompete agreement. Considering these facts in conjunction with the reasonable time and geographic restriction and the valid interest Welsco seeks to protect, this noncompete agreement is reasonable and seeks to prohibit more than mere ordinary competition.  The noncompete agreement is valid and enforceable under Arkansas law.

### IV.    Preliminary Injunction

In determining whether to grant preliminary injunctive relief, district courts in the Eighth Circuit must consider the following factors:  "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc*., 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  No single factor is dispositive. *Id.*  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined." *Id.*  It is settled that "[w]hen there is an adequate remedy at law, a preliminary injunction is not appropriate." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citing M*odern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir. 1989)).

As a threshold matter, the Court notes that the noncompete agreement contains a provision that purports to mandate injunctive relief in the event that the noncompete agreement is violated (Dkt. No. 5, at 5 ¶ 4).  However, "[t]he parties cannot by contract require a Court to recognize any particular equitable remedy in the event of a breach of contract." *Am. Express Fin. Advisors, Inc. v. Hazlewoo*d, No. 4:05-cv-936-GTE, U.S. Dist. LEXIS 43262, at *5.  As

expressed in the *Restatement (Second) of Contracts*, "[b]ecause the availability of equitable relief was historically viewed as a matter of jurisdiction, the parties cannot vary by agreement the requirement of inadequacy of damages . . . ." § 359, comment b.  Therefore, the provision that purports to mandate injunctive relief is not binding on the Court.

Here, the Court concludes that Welsco is not entitled to a preliminary injunction.  Welsco as the movant has the burden of showing the threat of irreparable harm and the absence of such a showing is alone sufficient ground to deny the preliminary injunction.  *Roberts v. Van Buren Public Schools*, 731 F.2d 523, 526 (8th Cir. 1984).  Welsco does not face irreparable harm because there is an adequate remedy at law.  Money damages will serve as an adequate remedy here, and the Court is not persuaded that it should grant the extraordinary relief of a preliminary injunction.  The Court is aware of a few Arkansas state and federal cases determining that "an action for damages is inadequate in a case involving the breach of a covenant not to compete." *Freeman*, 102 Ark. App. at 80, 281 S.W.3d at 754.  This determination relates back to the case of *Bailey v. King*, 240 Ark. 245, 398 S.W.2d 906 (1966), in which the Arkansas Supreme Court observed:  "The breach of a covenant not to compete is, of course, of a continuing nature, and an action for damages is hardly adequate, mainly because of the extreme difficulty in determining the amount of damage caused by loss of business.  It appears that the only realistic relief for a breach of this type of contract is by injunction." *Id.* at 249, 398 S.W.2d at 908.  However, the parties presented testimony at the preliminary injunction hearing that demonstrates money damages are calculable and will be adequate in this case.  The Court is not persuaded by Mr. Layton's testimony on Welsco's behalf first given at the hearing that external factors such as potential market changes and uncertainty predicting how Welsco's sales might have fared had Mr. Brace not departed make it impossible to calculate money damages.  To the contrary, the

Court finds Mr. Layton's testimony persuasive that there is an adequate remedy at law in this case.

Welsco presented testimony that approximately 90 percent of Mr. Brace's sales for Welsco were through the 798 union, specifically to individual members of the 798 union. Welsco asserts that in the first quarter of 2012, the 798 union accounted for $159,000 in sales. According to Welsco, since Mr. Brace left Welsco on April 30, 2012, Welsco has done about $400 in sales through the 798 union and its members.  Welsco maintains that, at the time of his departure, Mr. Brace was averaging $60,000 per month in sales through the 798 union.  Welsco contends that its sales through the 798 union had steadily increased over Mr. Brace's Welsco-tenure.  Welsco asserts—and Mr. Brace does not dispute—that the members of the 798 union are still buying from Mr. Brace through his new employer.  The Court notes that Mr. Layton did not testify that anything about how Welsco tracks sales to the 798 union's members would complicate a computation of money damages.  On these facts there is little doubt that Welsco can ascertain the amount of damages it will suffer over the course of Mr. Brace's one-year noncompete term.  Welsco acknowledges it will be able to look at Mr. Brace's sales figures throughout his tenure at Welsco and compare those with both Welsco's current sales figures and Mr. Brace's current sales figures at Gas & Supply.  Therefore, the Court determines Welsco has an adequate remedy at law, and the Court will not issue a preliminary injunction.

\*   \*   \*

For the reasons set out above, Welsco's Motion for Prelimiary Injunction (Dkt. No. 5) is denied.

SO ORDERED this the __17__ day of September, 2012.

_Kristine G. Baker_
Kristine G. Baker
United States District Judge