**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**WELSCO, INC.**                                                                            **PLAINTIFF**

**v.**                              **Case No. 4:12-cv-00394-KGB**

**MIKE BRACE**                                                                          **DEFENDANT**

## OPINION AND ORDER

Plaintiff Welsco, Inc. ("Welsco") brings this action against defendant Mike Brace, Welsco's former employee, alleging breach of a covenant not to compete, a violation of the Arkansas Trade Secrets Act ("ATSA"), Ark. Code Ann. §§ 4-75-601 *et seq.*, breach of fiduciary duty and duty of loyalty, and tortious interference. Welsco also seeks a declaratory judgment that the covenant not to compete is binding and fully enforceable under Arkansas law. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

Before the Court is Welsco's motion for summary judgment (Dkt. No. 56). Mr. Brace has responded (Dkt. No. 83), and Welsco has replied (Dkt. No. 121). Also before the Court is Mr. Brace's motion for summary judgment (Dkt. No. 62). Welsco has responded (Dkt. No. 88), and Mr. Brace has replied (Dkt. No. 120). Along with the pending motions for summary judgment, before the Court is Mr. Brace's motion to strike or, in the alternative, objections to consideration of, Adam Kohler's affidavit (Dkt. No. 86). Welsco has responded (Dkt. No. 124), and Mr. Brace has replied (Dkt. No. 126). For the following reasons, Welsco's motion for summary judgment is granted in part and denied in part (Dkt. No. 56), and Mr. Brace's motion for summary judgment is granted in part and denied in part (Dkt. No. 62). The Court also grants in part and denies in part Mr. Brace's motion to strike, and in the alternative, objections to the consideration of Mr. Kohler's affidavit (Dkt. No. 86).

## I.      Factual Background

The Court previously set forth the factual background of this case in its Opinion and Order denying Welsco's motion for preliminary injunction (Dkt. No. 33).  The Court's Opinion and Order made several factual determinations based on the evidence and testimony submitted at the preliminary injunction hearing.  That evidence received at the preliminary injunction hearing is now part of the trial record.  *See* Fed. R. Civ. P. 65(a)(2).

Welsco is an Arkansas corporation with its principal place of business in Arkansas. Welsco's primary business is distributing welding supplies and industrial gas.  Mr. Brace, who currently is a citizen of Oklahoma, was employed by Welsco from March 15, 2005, through April 30, 2012, as the branch manager of Welsco's Tulsa, Oklahoma, store.  Mr. Brace resigned on April 30, 2012, and began to work for Gas & Supply, a competitor of Welsco.

Sometime before March 15, 2005, and before Mr. Brace became an Oklahoma resident, he interviewed for employment with Welsco at the company's Arkansas headquarters.  Mr. Brace accepted employment with Welsco after the Arkansas interview, relocated to Tulsa, Oklahoma, and, at some point in March 2005, received from Welsco through the mail a noncompete agreement addressed to Mr. Brace in Tulsa.  At the preliminary injunction hearing, Chris Layton, a vice president for sales for Welsco who oversaw Welsco's Tulsa store, could not specifically recall having had a conversation with Mr. Brace about the noncompete agreement during Mr. Brace's interview in Arkansas.  However, according to Welsco and Mr. Layton, as a standard practice, Welsco always discusses noncompete agreements in interviews prior to hiring employees and requires salespeople to sign noncompete agreements as a condition of employment.  Mr. Brace asserts that a noncompete agreement was not discussed during his interview in Arkansas and that he received the noncompete agreement in the mail from Welsco

without any prior discussion.  However, Mr. Brace admits that he executed the noncompete agreement in Oklahoma and returned it to Welsco in Arkansas, without questioning or negotiating with Welsco any of its terms (Dkt. No. 85, ¶ 7).  In addition, Mr. Brace sought the advice of an attorney in Oklahoma before signing the noncompete agreement (*Id.*, ¶ 6).

Welsco contends that, prior to joining Welsco, Mr. Brace had not worked in a position in which he solicited sales.  Mr. Brace disputes this and maintains that he assisted in making sales during his employment at Miller Electric, prior to joining Welsco (Dkt. No. 85, ¶ 9; Dkt. No. 38, at 170).  Both parties cite Mr. Brace's testimony at the preliminary injunction hearing.  Mr. Brace testified that he was a welding engineer in Miller Electric's industrial products group and worked in "technical sales," helping distributors sell products to the end user (Dkt. No. 38, at 94-95, 168-70).  However, Mr. Brace said he did not directly sell products to customers (*Id.* at 95).

Welsco asserts that, while a Welsco employee, Mr. Brace received training in Arkansas regarding the welding and industrial gas supply business and frequently traveled to Arkansas for management meetings.  Mr. Brace denies that he received any "special" training, asserting that the training he received at Welsco was conducted by product manufacturers.  Mr. Brace denies that he frequently traveled to Arkansas for management meetings, yet he admits that he traveled to Arkansas for management meetings four to seven times per year (Dkt. No. 85, ¶ 10).

Welsco asserts, and the Court previously found, that, in his role as a Welsco manager, Mr. Brace solicited existing and prospective clients on Welsco's behalf and was involved in marketing, strategic planning, and company operations.  Mr. Brace now denies this, although he cites no record evidence in support of this denial (Dkt. No. 85, ¶ 12).  Mr. Brace also disputes Welsco's assertion and the Court's previous finding that, because of his position at Welsco, Mr. Brace had access to detailed confidential information regarding Welsco clients, clients' needs,

company finances, cost information, product specifications, and the like (*Id.*, ¶ 13).  Mr. Brace contends that this information was not confidential in nature, primarily relying on the deposition testimony of Russell Walker, Welsco's current branch manager, that some customer information can be discovered through word of mouth and that some pricing can be ascertained by other distributors with passwords to access cost information on manufacturers' websites (Dkt. No. 64, ¶¶ 19-23; Dkt. No. 62-10).  Welsco disputes Mr. Brace's characterization of Mr. Walker's testimony (Dkt. No. 89, ¶¶ 19-23).

The Court notes that Mr. Brace testified at the preliminary injunction hearing that Welsco's client lists included pricing and cost information that would be considered confidential and which would be of value to a competitor.  He agreed that he did not forget this information as soon as he left Welsco and that, even without a hard copy of Welsco's pricing and cost information, a person could use the information to Welsco's detriment, for example, by undercutting Welsco's price to a particular customer (Dkt. No. 38, at 106-08).  On examination by his attorney, Mr. Brace said that knowing the prices Welsco charges customer would not be beneficial to him at Gas & Supply because Gas & Supply's pricing is different (Dkt. No. 38, at 173).  On, redirect, however, Mr. Brace agreed that, even if Gas & Supply had better prices than Welsco's prices, knowing Welsco's prices would allow Gas & Supply to increase its own prices to increase profits while still remaining competitive with Welsco (*Id.* at 191).

Welsco also asserts that Mr. Brace received from Welsco within months of his resignation confidential company information that he should have returned to Welsco after reviewing and commenting on it.  At the preliminary injunction hearing, Mr. Layton testified regarding a contract pricing list to which only certain employees have access.  Mr. Layton said the pricing list is sent in hard copy to store managers with instructions to return the list after

reviewing and commenting on the list.  Mr. Layton said that Mr. Brace failed to return the pricing list and that he was unable to find the list in the Tulsa store after Mr. Brace left Welsco (Dkt. No. 38, at 28-30, 74).  At the preliminary injunction hearing, Mr. Brace testified that he was not sure what he did with the contract pricing list, has no recollection what he did with the list, and does not recall being instructed to return the list (Dkt. No. 38, at 80).  Mr. Brace now disputes that he retained or failed to return confidential information of Welsco, citing his own declaration to that effect as well as the testimony of two former Welsco employees that they have no knowledge that Mr. Brace took confidential information (Dkt. No. 85, ¶ 35).

The parties agree that Mr. Brace's sales were concentrated largely in Tulsa County, Oklahoma, and the surrounding counties and that a large majority of Mr. Brace's sales came from the 798 union pipefitters and welders union ("the 798 Union"), which is based in Tulsa, Oklahoma (Dkt. No. 85, ¶ 14).  Mr. Brace does not dispute Welsco's estimate that 90 percent of Mr. Brace's sales came from selling Welsco's products to the 798 Union's training center and to the 798 Union's individual members (Dkt. No. 85, ¶ 15).

It is undisputed that, even though Welsco, through its then-salesman Mr. Brace, sold products to the individual members of the 798 Union, Welsco essentially considered the customer to be the 798 Union, not the individual members.  In fact, during the period of Mr. Brace's employment with Welsco, Welsco did not track individual sales to members of the 798 Union by individual name.  Instead, it recorded the sale or sales to "the 798 Union."  However, Mr. Brace now contends that the 798 Union as a whole was never the customer of Welsco, regardless of how Welsco tracked sales, or the customer of Gas & Supply (Dkt. No. 64, ¶ 36). He relies largely on Mr. Layton's testimony that sales to the 798 Union can be broken down into two categories, sales to the 798 Union training center as opposed to "direct sales" to the 798

Union's individual members, although the fact that Welsco sold and sells products to the individual members of the 798 Union was never in dispute (Dkt. No. 62-9, at 4-5).

When members of the 798 Union needed new equipment, they would often approach a man named Roger Hobrock, who works for Miller Electric and has an office in the 798 Union Hall.   Miller Electric apparently does not sell directly to the public products comparable to Welsco's or Gas & Supply's products.  Therefore, Mr. Hobrock would pass orders of individual members of the 798 Union to Welsco through Mr. Brace.  Mr. Brace testified at the preliminary injunction hearing that 40 to 50 percent of his business at Welsco with the 798 Union involved Mr. Hobrock.

The parties agree that sales through the 798 Union had steadily increased during the period of Mr. Brace's employment with Welsco (Dkt. No. 85, ¶ 18).  Welsco asserts that the increase in Mr. Brace's sales was due to his face-to-face contact with customers and the relationships he built while employed by Welsco.  Mr. Brace disputes this (Dkt. No. 85, ¶ 19).

Mr. Brace contends that he increased Welsco's sales during his employment by making sales to, and receiving referrals from, representatives of companies who chose to do business with him based on their long personal relationships with him which he established several years before he became an employee of Welsco.   Mr. Brace maintains that, in particular, representatives of 798 Union and Henkels & McCoy, another customer, considered their business to be with Mr. Brace, not Welsco (Dkt. No. 64, ¶ 20).  Welsco does not dispute this statement.  However, Welsco contends that Mr. Brace would not have developed his customer relationships with the 798 Union, its members, and other Welsco clients and vendors, but for his employment with Welsco and the fact that he was selling products on Welsco's behalf (Dkt. No. 59, ¶ 16).  Welsco further asserts that it took Mr. Brace several years with Welsco to cultivate

these relationships to the point that they became profitable (*Id.*, ¶ 17).  Mr. Brace denies both statements, asserting in response that he developed relationships with these customers prior to his employment with Welsco and without any assistance from Welsco (Dkt. No. 85, ¶¶ 16, 17).  In support, Mr. Brace cites his testimony at the preliminary injunction hearing that he met Mr. Hobrock before working at Welsco and had assisted Mr. Hobrock in making sales (Dkt. No. 38, at 169-70).  Mr. Brace also cites the declarations of Charles Beddingfield, a welder foreman with Henkels & McCoy, and Danny Hendrix, who is currently the business manager of the 798 Union and who previously held other positions with the 798 Union's training center (Dkt. Nos. 83-3, 83-4).  Mr. Beddingfield and Mr. Hendrix state that they met Mr. Brace while he was working at Miller Electric, have used Mr. Brace as their salesman since 1999 and 2002, respectively, and consider their business relationship with Mr. Brace, not with any company.

Welsco asserts that Mr. Brace, on behalf of Gas & Supply, has engaged in soliciting and procuring business from Welsco's clients with whom he did business while he was a Welsco employee.  It is undisputed that members of the 798 Union and other former Welsco customers with whom Mr. Brace had done business continued to do business with him at Gas & Supply.  It is undisputed that, shortly after leaving Welsco and joining Gas & Supply, Mr. Brace set up a desk in the same building as the 798 Union training center within a few feet of Mr. Hobrock's desk and that Mr. Hobrock continues to pass orders of individual members of the 798 Union to Mr. Brace, which benefits Mr. Brace's new employer, Gas & Supply.  Mr. Brace specifically said that this was for the purpose of handling sales to 798 Union members (Dkt. No. 88-2, at 60).  Mr. Brace also admits to hanging a sign at the 798 Union building instructing readers, "For parts, service, accessories, call Mike Brace" (Dkt. No. 56-5, at 11, 19), although he says that the signs

were up for less than a day and "generally advertised Gas & Supply's and [his] services to the public" (Dkt. No. 85, at 10; Dkt. No. 83-6, at 9-10).

It is undisputed that Mr. Brace used the same cell phone number for sales at Gas & Supply as he did at Welsco. When a Welsco customer called him, he would inform the customer that he was no longer with Welsco, that he now worked with Gas & Supply, that the customer was free to do business with Gas & Supply, and that, if the customer wanted to do business with him directly, the customer needed to send an email or fax addressed to Todd Smith at Gas & Supply requesting Mr. Brace by name as their salesman (Dkt. No. 38, at 78, 176). Mr. Brace contends, however, that he in no way encouraged the customer to use Gas & Supply, relying in part on emails and letters from certain customers requesting Mr. Brace as their salesperson (Dkt. No. 85, ¶ 26; Dkt. Nos. 83-13 to 83-18). Mr. Brace denies that these activities constituted soliciting or procuring customers.[1]

Welsco asserts that the 798 Union accounted for $159,000 in sales in the first quarter of 2012 (Dkt. No. 59, ¶ 21). Mr. Brace denies this and contends that this assertion lacks support in the record (Dkt. No. 85, ¶ 21). Since Mr. Brace's departure, Welsco has done very little business through the 798 Union. Welsco asserts that it has done approximately $400 in sales through the 798 Union since Mr. Brace's resignation. According to Welsco, at the time of his departure, Mr. Brace was averaging $60,000 per month in sales through the 798 Union. Welsco contends that, when Mr. Brace began to work for Gas & Supply, he continued to sell welding and industrial gas

---

[1] Mr. Brace goes so far as to assert that he never solicited or procured business of the individual members of the 798 Union *while at Welsco*, claiming instead that Mr. Hobrock "would negotiate the transaction with the individual union members and refer the sale to Brace" (Dkt. No. 64, ¶ 39). This contradicts Mr. Brace's testimony in his first deposition that, other than orders he received from Mr. Hobrock, Mr. Brace obtained orders directly from members of the 798 Union (Dkt. No. 88-2, at 3).

equipment to customers who formerly purchased such equipment from Welsco, including members of the 798 Union.

Welsco contends that its employees have attempted to continue selling to the 798 Union training center and individual members since Mr. Brace's departure but that, despite these efforts, Welsco is no longer welcome at the 798 Union (Dkt. No. 59, ¶¶ 32-33). Mr. Brace agrees that Welsco is no longer welcome at the training center and that representatives of the 798 Union do not desire to deal with Welsco, but Mr. Brace attributes this to Welsco's accusing Mr. Hobrock of misusing funds he received from individual members of the 798 Union (Dkt. No. 85, ¶ 33). Welsco asserts that Mr. Brace testified that the 798 Union stopped business with Welsco after Mr. Brace informed the Union that Welsco sued him and opined that he believed that there was no validity to Welsco's allegations against Mr. Hobrock. Mr. Brace contends that this is a mischaracterization of his testimony, yet his response seems consistent with Welsco's version of his testimony—he claims that the 798 Union stopped business with Welsco because Welsco "improperly" accused Mr. Hobrock of misusing customer funds and because representatives of the 798 Union felt that Welsco's filing of this lawsuit against Mr. Brace was wrong and inappropriate—although he adds his assertion that the 798 Union considered their business to be with Mr. Brace (Dkt. No. 85, ¶ 34).

Mr. Brace also contends that Welsco took no actions to attempt to maintain its relationships with the 798 Union, its members, and the other customers listed in Welsco's damages model (Dkt. No. 64, ¶ 28). Mr. Brace cites Mr. Layton's deposition testimony that he has no information that Welsco contacted certain of these customers to try to maintain their business after Mr. Brace left (Dkt. No. 62-9, at 13). However, Mr. Layton testified at the preliminary injunction hearing and in his deposition that Welsco attempted to reach out to

several of these customers, including the 798 Union, through his own visits or sending Welsco employees to make contact (Dkt. No. 38, at 40).  Although these visits were relatively few, the testimony suggests it became apparent relatively quickly that further efforts were futile after Welsco was no longer welcome at the 798 Union.  Moreover, Mr. Brace himself testified that the director of the training center said that Mr. Layton and Scott Stinson, Mr. Brace's first replacement, had been to the 798 Union attempting to get business (Dkt. No. 56-5, at 12).

Mr. Brace also contends that Welsco has not attempted to ascertain why customers left Welsco after Mr. Brace resigned, citing the June 2013 deposition testimony of Adam Kohler, Welsco's Chief Financial Officer ("CFO") and Chief Operating Office ("COO") (Dkt. No. 64, ¶ 29).  While Mr. Kohler testified that he did not consider alternative causes for the customers leaving Welsco, he explained that he did not believe there were any other plausible reasons for the loss of customers besides Mr. Brace's breach of the noncompete agreement (Dkt. No. 62-7, at 6-9).

Welsco also asserts that Mr. Brace offered jobs at Gas & Supply to two Welsco employees, Cliff Edwards and Russell Walker, who Gas & Supply asked Mr. Brace to target with offers of employment.  Mr. Brace previously did not seem to dispute this, but he now contends that he did not solicit any employees while he was still an employee of Welsco (Dkt. No. 64, ¶ 10).  There is conflicting testimony on this issue.  Mr. Edwards and Mr. Walker testified that Mr. Brace did not solicit them before he left Welsco (Dkt. No. 62-8, at 5; Dkt. No. 62-10, at 5).  However, Mr. Brace testified at his August 2012 deposition that he spoke to Mr. Edwards and Mr. Walker before leaving Welsco about coming to work for Gas & Supply (Dkt. No. 88-2, at 6-7).  In addition, Mr. Brace agreed at the preliminary injunction hearing that, before he left Welsco, he was soliciting Welsco employees to leave and go to Gas & Supply, although

he later said that he only spoke with Mr. Walker about employment at Gas & Supply before leaving Welsco (Dkt. No. 38, at 122, 133).  Beyond this dispute, both parties acknowledge that neither Mr. Edwards nor Mr. Walker resigned from their employment with Welsco or received an offer of employment from Gas & Supply, and Welsco admits it did not have to pay additional compensation to induce Mr. Edwards or Mr. Walker not to work for Gas & Supply (Dkt. No. 89, ¶¶ 11-12).

## II.      Summary Judgment Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.      Summary Of The Arguments

Welsco moves for partial summary judgment on its breach of contract claims that Mr. Brace violated the noncompete agreement by (a) soliciting and/or procuring sales from Welsco customers; (b) participating and assisting in the operations, promotions, or organization of a competitor; and (c) appropriating Welsco's asset of good will.  As to these claims, Welsco moves for summary judgment on liability only, leaving damages to be determined at trial. Welsco does not move for summary judgment on, or otherwise address, its claim for breach of contract relating to the use or disclosure of confidential information or its other, non-contractual claims.

Mr. Brace moves for summary judgment on all of Welsco's claims.  Mr. Brace argues that Oklahoma law governs the noncompete agreement and that the noncompete agreement is unenforceable under either Oklahoma or Arkansas law.  Alternatively, Mr. Brace argues that the evidence disproves essential elements of Welsco's breach of contract claims.  Mr. Brace further contends that Welsco has failed to establish the essential elements of its claims for tortious interference, breach of duty, or violation of the ATSA.  Before reaching the merits of the parties' arguments, the Court will address several preliminary matters that bear on the Court's consideration of the pending motions for summary judgment.

## IV.     Challenges To Mr. Kohler's Testimony

### A.     Mr. Brace's Motion To Strike

Along with the pending motions for summary judgment, before the Court is Mr. Brace's motion to strike or, in the alternative, objections to consideration of, Adam Kohler's affidavit (Dkt. No. 86).  Welsco has responded (Dkt. No. 124), and Mr. Brace has replied (Dkt. No. 126). Mr. Brace's motion challenges Mr. Kohler's affidavit dated September 12, 2013, that Welsco submitted in support of its motion for summary judgment (Dkt. No. 56-4).   Mr. Brace

specifically moves to strike paragraphs three, four, five, six, seven, and ten of Mr. Kohler's September 12, 2013, affidavit.

The standard that guides the Court's consideration of evidence at the summary judgment stage of the proceeding is not whether the evidence would be admissible at trial—"it is whether it *could* be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012). Rule 56 of the Federal Rules of Civil Procedure permits a party to object to evidence cited by the other party at the summary judgment stage and requires the Court to make a determination regarding whether the evidence could be presented at trial in an admissible form. *See* Fed. R. Civ. P. 56(c)(2).

Turning to the challenged statements, paragraph three states that Mr. Brace did not have sales experience prior to his employment with Welsco. Paragraphs four and five state that Welsco encouraged Mr. Brace to develop business relationships with clients, expended resources to allow him to do so, and that Mr. Brace would not have developed those business relationships but for his employment with Welsco. Paragraph six states that, despite Welsco's efforts, Welsco has made almost no new sales to the 798 Union training center or members since Mr. Brace left Welsco's employment. Paragraph seven states that Welsco is no longer welcome at the 798 Union, although Welsco employees continue to try to make sales calls on the 798 Union and its members, and that Welsco's relationship with the 798 Union does not appear salvageable. Lastly, paragraph ten states that Welsco has been damaged by Mr. Brace's alleged breach of the non-compete agreement and that Welsco has lost sales from its previously established customers, including the 798 Union members and training center.

Mr. Brace first argues that Mr. Kohler's affidavit contains inadmissible opinions and conclusions of law and fact that are unsupported by any predicate facts or personal knowledge.

Rule 56 of the Federal Rules of Civil Procedure provides that an affidavit or declaration used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Similarly, Federal Rule of Evidence 602 states that a lay witness "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. This is a minimal standard that accommodates the broader policy of Article VI of the Federal Rules of Evidence to eliminate unnecessary restrictions on witness testimony and, instead, rely on the jury's ability to give evidence its proper weight. 27 Fed. Prac. & Proc. Evid. § 6022 (2d ed.).

Evidence of personal knowledge may, but need not, consist of the witness's own testimony. Fed. R. Evid. 602; *United States v. Wirtz*, 357 F. Supp. 2d 1164, 1169 (D. Minn. 2005). Personal knowledge can include "inferences and opinions, as long as they are grounded in personal observations and experience." *Wirtz*, 357 F. Supp. 2d at 1169 (quoting *United States v. Rodriguez,* 162 F.3d 135, 144 (1st Cir. 1998)). Personal knowledge "is not an absolute but may consist of what the witness thinks he knows from personal perception." Fed. R. Evid. 602, advisory committee's note. In other words, Rule 602 "excludes testimony concerning matter the witness did not observe or had no opportunity to observe." *Kemp v. Balboa*, 23 F.3d 211, 213 (8th Cir. 1994) (quoting *U.S. v. Lyon*, 567 F.2d 777, 783-84 (8th Cir. 1977)).

The Court considers the personal knowledge requirement alongside Rule 701, which allows a lay witness to testify about his opinions or inferences if they are rationally based on the perception of the witness and aid the jury in understanding the witness's testimony or the determination of a fact. Fed. R. Evid. 701; *see Wirtz*, 357 F. Supp. 2d at 1169. "The general

application of Rule 701 indicates that a lay witness may testify about facts within his or her range of generalized knowledge, experience, and perception." *United States v. Espino*, 317 F.3d 788, 797 (8th Cir. 2003); *see also United States v. Oliver*, 908 F.2d 260, 264 (8th Cir. 1990).

The Court first considers Mr. Brace's challenges based on personal knowledge. Mr. Kohler's affidavit states, and the record shows, that Mr. Kohler has served as either Welsco's CFO or COO during Mr. Brace's employment with Welsco. For purposes of resolving this motion, the Court finds that, by virtue of Mr. Kohler's positions with Welsco, Welsco has made a sufficient showing of Mr. Kohler's personal knowledge and competency to testify to the matters in the paragraphs that Mr. Brace challenges, except for paragraph three. In that paragraph, Mr. Kohler speaks to Mr. Brace's sales experience prior to joining Welsco. Mr. Kohler testified in his June 2013 deposition that he was not involved in Mr. Brace's hiring, and Welsco has not sufficiently established the source of Mr. Kohler's personal knowledge on Mr. Brace's experience prior to his employment with Welsco. That said, the record contains Mr. Brace and Mr. Layton's testimony regarding Mr. Brace's background prior to his employment with Welsco, and the Court finds it unnecessary to consider Mr. Kohler's affidavit on the subject to resolve the pending motions for summary judgment.

Beyond personal knowledge, the Court rejects Mr. Brace's arguments that the challenged paragraphs of Mr. Kohler's affidavit lack specificity and state impermissible legal conclusions. To the extent that the challenged paragraphs of Mr. Kohler's affidavit contain conclusions or inferences, the Court finds for purposes of resolving this motion that the testimony is permissible under Rule 701.

Mr. Brace also argues that paragraphs four and ten are inconsistent with Mr. Kohler's previous testimony. For purposes of summary judgment, the Court resolves any conflicting

testimony in favor of the nonmovant unless "the inconsistency represents only an effort . . . to manufacture a sham issue of fact." *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1126 (8th Cir. 2008). A party cannot "create a genuine issue of material fact simply by submitting an affidavit that contradict[s] testimony at a prior deposition, where there were no 'legitimate reasons' for the filing of an inconsistent affidavit." *Id.* at 1126 (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983)). "[D]istrict courts should examine inconsistent submissions 'with extreme care,' and limit the grant of summary judgment to cases where a conflict between deposition and affidavit presents 'only sham issues.'" *Id.* at 1126-27 (quoting *Camfield Tires, Inc.*, 719 F.2d at 1366). An inconsistent affidavit can generate a genuine issue of fact only if it does "not purport to raise a new matter, but rather to explain certain aspects" of previous testimony or if confusion contributed to the inconsistency. *Camfield Tires, Inc.*, 719 F.2d at 1364 (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894-895 (5th Cir. 1980)). Where an affiant states in his affidavit that he was confused in his deposition or desires to explain portions of his deposition, or where the affidavit does not actually contradict the earlier testimony, the Court should not strike the affidavit from the record. *City of St. Joseph, Mo. v. Sw. Bell Tel.*, 439 F.3d 468, 476 (8th Cir. 2006).

As stated above, Mr. Kohler states in paragraph four of his affidavit that Welsco encouraged Mr. Brace to develop business relationships with clients and provided Mr. Brace with the time and resources to do so. Mr. Brace contends that this paragraph contradicts Mr. Kohler's previous deposition testimony that Welsco did not incur expenses in the development of Mr. Brace's relationship with customers Welsco claims Mr. Brace solicited (Dkt. No. 86-1, at 3-5). Welsco argues that paragraph four does not directly contradict Mr. Kohler's deposition testimony. In his deposition, Mr. Kohler testified that he did not consider avoided costs in his

damages calculations because Mr. Brace "didn't wine and dine [customers] a lot that I'm aware of" (Dkt. No. 124-2, at 4).  Mr. Kohler said that Welsco reimbursed Mr. Brace any time Mr. Brace took clients to lunch or dinner but that Mr. Kohler did not recall seeing such an expense come through for some time and had not gone back and reviewed Mr. Brace's expense reports (*Id.*; Dkt. No. 86-1, at 3-4).  In addition, Welsco attaches to its response another affidavit from Mr. Kohler explaining that he went back and reviewed expense reports after his deposition and before providing the affidavit in support of Welsco's motion for summary judgment (Dkt. No. 124-3).  Welsco further argues that there can be no claim of surprise in view of Mr. Layton's testimony at the preliminary injunction hearing about business development expenses Welsco paid for Mr. Brace (Dkt. No. 38, at 35-36).

To the extent that paragraph four is inconsistent with Mr. Kohler's deposition testimony, in view of Mr. Kohler's explanation for the inconsistency and in view of Mr. Layton's previous testimony on the issue, the Court finds that paragraph four is not an attempt to present a sham issue.  Accordingly, the Court denies Mr. Brace's motion to strike paragraph four.

In paragraph ten, Mr. Kohler states that Welsco has been damaged by Mr. Brace's alleged breach of the noncompete agreement and that Welsco's damages include sales Welsco lost from its previously established customers, including the 798 Union training center and members.  Mr. Brace contends that this is inconsistent with Mr. Kohler's deposition testimony in that, according to Mr. Brace, Mr. Kohler testified that Welsco has not attempted to ascertain why customers left Welsco.  The Court rejects this argument.  Mr. Kohler testified that, for purposes of his damages calculation, he did not attempt to rule out causes of the lost business other than Mr. Brace's actions because Mr. Kohler did not believe that there were other plausible reasons

for the customers at issue leaving Welsco (Dkt. No. 90-2, at 6). Paragraph ten of Mr. Kohler's affidavit does not contradict his deposition testimony.

For these reasons, the Court grants in part and denies in part Mr. Brace's motion to strike, and in the alternative, objections to the consideration of Mr. Kohler's affidavit (Dkt. No. 86). The Court sustains Mr. Brace's objections to paragraph three of Mr. Kohler's affidavit and has not considered paragraph three in deciding the parties' pending motions for summary judgment. The Court denies Mr. Brace's motion in all other respects, including Mr. Brace's request to strike the affidavit. As a final matter, the Court notes that Welsco does not rely exclusively on any of the challenged paragraphs in support of its motion for summary judgment. For example, with the exception of paragraph six of Mr. Kohler's affidavit, Welsco's statement of facts cites in support other record evidence, along with the challenged provisions of Mr. Kohler's affidavit (Dkt. No. 59, ¶¶ 16, 31, 32-33). Paragraphs three, four, and ten of Mr. Kohler's affidavit are not cited at all in Welsco's statement of facts.

### B. Mr. Brace's Objections To Mr. Kohler's Second Affidavit

The Court also will consider Mr. Brace's objections to Mr. Kohler's second affidavit that Mr. Brace raises in his reply in support of his motion for summary judgment (Dkt. No. 120). Mr. Brace objects to an affidavit from Mr. Kohler dated October 3, 2013, that Welsco attached as an exhibit to its response to Mr. Brace's motion for summary judgment (Dkt. No. 88-3).

Mr. Brace first challenges Mr. Kohler's statement in paragraph three of the October 3, 2013, affidavit that "Welsco considers the Local 798 Union direct sales to be one customer through the Union" (Dkt. No. 88-3, ¶ 3). Mr. Brace's objection is little more than a factual dispute, and the Court overrules Mr. Brace's objection.

18

Mr. Brace challenges Mr. Kohler's statement in paragraph four of the October 3, 2013, affidavit that Mr. Kohler has knowledge that Mr. Brace violated the noncompete by soliciting and procuring customers during the noncompete period.  Mr. Brace contends that this statement is an inadmissible legal conclusion.  The Court does not agree.  The Court overrules Mr. Brace's objection to paragraph four.

Mr. Brace also objects that paragraphs five and six of Mr. Kohler's October 3, 2013, affidavit raise new issues and arguments that Welsco did not previously allege or disclose in that Mr. Kohler opines on the average duration of a sales relationship between Welsco and its Tulsa customers.  Mr. Brace states that these objections are at issue in two of his motions in *limine* (Dkt. Nos. 100, 101).  Welsco has not responded to those motions, and the Court finds it unnecessary to resolve those motions for purposes of deciding the parties' pending motions for summary judgment.

Lastly, Mr. Brace argues that paragraphs seven and ten of Mr. Kohler's October 3, 2013, affidavit contain vague testimony that is not based on personal knowledge.  Paragraph seven states Mr. Kohler's belief that, but for Mr. Brace's alleged breach of the noncompete, Welsco would have kept the business with its customers at issue for at least four years after the noncompete period.  Paragraph ten states that Welsco's customer information and pricing information are not readily available and that it would be nearly impossible for an individual to compile an aggregate of Welsco's confidential customer and pricing information.  The Court rejects Mr. Brace's challenges to these paragraphs.  The record is sufficient to establish Mr. Kohler's personal knowledge regarding the duration of Welsco's relationships with its customers and regarding the confidential nature of Welsco's pricing and customer information.  To the extent Mr. Brace challenges Mr. Kohler's opinion in paragraph seven, the Court finds that the

opinion is permissible under Rule 701, and it is for the jury to decide what weight to give to that

opinion.        **V.        Choice Of Law And Validity Of The Noncompete Agreement**

The Court now will address Mr. Brace's motion as to the choice-of-law issues and the

validity of the noncompete agreement.  Mr. Brace moves for summary judgment that Oklahoma

law applies to this case and that the noncompete agreement is invalid under either Oklahoma or

Arkansas law.  The Court previously considered these issues in ruling on Welsco's motion for

preliminary injunction.  By prior Opinion and Order, the Court ruled that Arkansas substantive

law governs this case and that the noncompete agreement is valid under Arkansas law (Dkt. No.

33).  The Court's rulings included certain findings based on evidence presented to the Court and

testimony presented at the preliminary injunction hearing.

Mr. Brace now asks the Court to revisit these rulings.  The Court notes the general rule

that findings of fact and conclusions of law made in deciding a motion for preliminary injunction

are provisional and are not binding at the trial on the merits.  *See Henderson v. Bodine

Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (quoting and citing *Univ. of Tex. v. Camenisch*,

451 U.S. 390, 395 (1981)).

In determining a choice-of-law issue in a diversity action, a federal court looks to the

choice-of-law principles of the forum state.  *Simpson v. Liberty Mut. Ins. Co.*, 28 F.3d 763, 764

(8th Cir. 1994).   Thus, Arkansas's choice-of-law principles govern whether Arkansas or

Oklahoma law applies to this noncompete agreement.   Because there is no choice-of-law

provision in the noncompete agreement between Welsco and Mr. Brace, the Court applies the

"significant contacts" test.  *See Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 929 (8th

Cir. 1999) (noting the trend of Arkansas cases to apply the significant contacts test to all

contracts without choice-of-law provisions).  "In cases not involving an effective choice of law

by the parties, the following factors are relevant to the determination of which state has the most significant relationship to a particular case:   (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Crisler v. Unum Insurance Co. of America*, 233 S.W.3d 658, 660 (Ark. 2006)) (citing *Restatement (Second) Conflict of Laws* § 188(2)); *see also Riceland Foods, Inc v. Liberty Mut. Ins. Co.*, No. 4:10CV00091 SWW, 2010 WL 3168228, at *2 (E.D. Ark. Aug. 6, 2010).

The Court previously applied these factors to the present case and, based on the evidence received and the testimony presented at the preliminary injunction hearing, concluded that the significant contacts test does not definitively require the Court to apply Arkansas or Oklahoma law (Dkt. No. 33, at 8-11).   The Court therefore invoked the principle followed by Arkansas courts that, where neither state has substantially greater contacts than the other, "the law of the state that would uphold the validity of the contract applies."   *Jones*, 180 F.3d at 929 n.5. Because Welsco conceded that the noncompete agreement would be invalid under Oklahoma law, the Court analyzed the noncompete agreement under Arkansas law and found it valid and enforceable under Arkansas law.

Mr. Brace in his motion argues that the significant contacts test requires applying Oklahoma law.   Mr. Brace relies on the same legal arguments previously made to the Court.   He cites no new factual support except for his own declaration, which largely repeats his previous testimony on these factors that was already considered by the Court (Dkt. No. 62-1).

The Court need not repeat in its entirety its previous application of the significant contacts test, but the Court notes that there remains a factual dispute as to whether and to what extent the noncompete agreement was discussed in Mr. Brace's initial interview in Arkansas,

which impacts the Court's analysis of the first and second factors which require the Court to consider the place of contracting and the place of negotiation of the contract.  In the Court's prior ruling, the Court did not find credible Mr. Brace's testimony that the noncompete agreement was not discussed in his interview, an assertion he now repeats in his declaration (Dkt. No. 62-1, at ¶ 3).  The Court recognizes that it is not to make credibility determinations in deciding a motion for summary judgment.  That said, the Court's prior ruling did not turn exclusively on this credibility finding.  The Court need not find a mathematically precise tie in the above factors to invoke the principle that the Court should the select the law of the state that will uphold the validity of the contract because Arkansas courts have fallen back on that principle when neither state has "*substantially* greater contacts than the other." *Jones*, 180 F.3d at 929 n.5.

Applying Arkansas law, the Court previously found that the noncompete agreement is valid and enforceable.  As discussed in the Court's Opinion and Order denying Welsco's motion for preliminary injunction, to uphold a covenant not to complete in the context of an employment contract, an employer generally must meet three requirements:  (1) the employer has a valid interest to protect; (2) the geographic restriction is not overly broad; and (3) a reasonable time limit is given." *Rebsamen Ins. v. Milton*, 600 S.W.2d 441, 443-44 (Ark. Ct. App. 1980).

Applying these principles, the Court previously ruled that the noncompete agreement is valid and enforceable under Arkansas law.  The Court found that the noncompete was intended to protect a valid interest.  Welsco primarily seeks to protect its "lists of customers, their needs and requirements, and business methods" (Dkt. No. 56-1, ¶1).  The noncompete agreement purports to prevent Mr. Brace from being able to "solicit or procure any of [Welsco's] customers whom or which he had dealt with on behalf of [Welsco] in an effort to obtain or retain their business other than on behalf of [Welsco]" for a period of one year following the end of his

employment with Welsco (Dkt. No. 5, at 4).  The noncompete agreement is restricted to "the counties in which employee has engaged in business activities for [Welsco], during the last six (6) months" (Dkt. No. 5, at 4).  Arkansas law is settled that customer lists, which include those customers' needs and requirements, constitute a valid interest to protect through a noncompete agreement.  *See Freeman v. Brown Hiller, Inc.*, 281 S.W.3d 749, 755 (Ark. Ct. App. 2008). Furthermore, Welsco has a legitimate interest in protecting its stock of customers from appropriation by an employee, especially in this situation where its "employee deals with customers away from the business and builds up personal relationships that bind the customers to him." *Id.*

Mr. Brace contends that the noncompete does not protect a legitimate interest.  He argues primarily that Welsco's pricing and sales information to which he was privy are not protectable interests.  He claims that Welsco's confidential information would have no value to a competitor because sales prices are set by salespersons and because customers' needs and Welsco's prices can fluctuate (Dkt. No. 63, at 25).  Based on this, he argues that information concerning a particular sale is of no economic value in a subsequent sale.  The Court is not persuaded by this argument.  There is considerable evidence in the record establishing the value of Welsco's confidential information, including Mr. Brace's own testimony.  Mr. Brace testified at the preliminary injunction hearing that Welsco's pricing and cost information would be considered confidential and would be of value to a competitor (Dkt. No. 38, at 106-07).

Despite this, Mr. Brace now argues that pricing information is not confidential because it is readily ascertainable by members of the general public or generally known by those in the industry and that Welsco takes no steps to protect the privacy of this information.  Mr. Brace's arguments rely on case law determining whether a business's information can be considered a

trade secret under the ATSA. *See, e.g., ConAgra, Inc. v. Tyson Foods, Inc.*, 30 S.W.3d 725, 729 (Ark. 2000); *Weigh Sys. S., Inc. v. Mark's Scales & Equip., Inc.*, 68 S.W.3d 299, 303 (Ark. 2002). These cases do not determine whether the noncompete protects a legitimate interest. For example, in *Girard v. Rebsamen Ins.*, 685 S.W.2d 526, 527-28 (Ark. Ct. App. 1985), the court found protected interests in a customer list and related information despite agreeing that "no trade secrets were shown to exist in appellee's business." Furthermore, as discussed in more detail below with regard to Welsco's claims under the ATSA, the record does not support Mr. Brace's factual claims on this point. The Court concludes that Welsco has a valid interest to protect with the noncompete agreement.

The Court also ruled that the geographical scope is not overly broad, specifically noting that the geographical scope was not greater than Welsco's trade area. *See Jaraki v. Cardiology Assocs. of Northeast Ark.*, 55 S.W.3d 799, 804 (Ark. Ct. App. 2001) ("In determining whether the geographic area is reasonable, the trade area of the former employer is viewed. *Where a geographic restriction is greater than the trade area, the restriction is too broad and the covenant not to compete is void.*") (emphasis added). The noncompete agreement bars competition only in the counties in which Mr. Brace did business for Welsco in the last six months of his employment. The testimony at the preliminary injunction hearing indicated that this would include Tulsa County and several surrounding counties, and the summary judgment record does not indicate otherwise. This is clearly less than Welsco's entire trade area and is a reasonable geographic restriction. Although the anti-solicitation clause does not expressly contain a geographical limitation, the Court previously emphasized that the noncompete agreement in *Freeman* was reasonable despite lacking an explicit geographic scope. 281 S.W.3d at 753. Here, the non-solicitation clause is reasonable because it is limited to the customer base

Welsco has a legitimate interest in protecting; it forbade Mr. Brace from soliciting or procuring customers with whom he had dealt on Welsco's behalf.  *See id.*; *Girard*, 685 S.W.3d at 529.

Likewise, the Court found that the one-year time limit is also reasonable.  *See Sensabaugh v. Farmers Ins. Exch.*, 420 F. Supp. 2d 980, 986 (E.D. Ark. 2006) (citing *Orkin Exterminating Co. v. Murrell*, 206 S.W.2d 185, 190 (Ark. 1947); *Statco Wireless, LLC v. Southwestern Bell Wireless, LLC*, 95 S.W.3d 13, 21-22 (Ark. Ct. App. 2003)).  Mr. Brace does not challenge the time limit in his motion for summary judgment.

Mr. Brace contends, however, that the Court's ruling only addressed the noncompete agreement's restriction "on active solicitation."  (Dkt. No. 120, at 10).  He contends that the Court did not address or find enforceable the noncompete agreement's restriction on Mr. Brace's ability to accept employment with a competitor and did not address "Welsco's assertions that the non-compete can operate to prohibit Brace from simply accepting unsolicited business from customers."  (*Id.*).  The Court disagrees.  The Court's prior ruling considered both the employment and solicitation aspects of the noncompete agreement.  Again, Mr. Brace alleges no error in the Court's analysis and presents no new evidence so as to warrant this Court altering its findings made at the earlier stage of the proceeding.

Mr. Brace also argues that the provision against procuring customers is an unreasonable restraint on trade to the extent Welsco interprets it to prohibit Mr. Brace from accepting unsolicited business (Dkt. No. 63, at 31-32).  Mr. Brace contends that restraints on an employee's ability to accept unsolicited business are invalid under Arkansas law, citing *Evans Laboratories, Inc. v. Melder*, 562 S.W.2d 62 (Ark. 1978), in which the court struck down a noncompete agreement that prohibited the former employee from merely accepting unsolicited business of his former employer.  This Court is not persuaded by this argument.  In *Girard*, the

Arkansas Court of Appeals rejected a similar argument in upholding a restrictive covenant without a geographical limitation that prohibited the employee from soliciting or *accepting* any insurance business on any account that he was servicing for the former employer at the time of his termination.   685 S.W.2d at 528-29.   Importantly, the court rejected the broad reading of *Melder* that Mr. Brace now advocates.   *Id.* ("We do not read *Melder* to invalidate all non-competition agreements that prohibit an employee from accepting—as opposed to soliciting—former employer customers.")

Lastly, Mr. Brace contends that the Court's prior ruling did not consider paragraph two of the noncompete agreement, the covenant not to appropriate good will.  That provision states:

> Employee recognizes and acknowledges that the good will existing between the Company, its' [sic] employee representatives, and its' [sic] customers or clients, are a unique and valuable asset of the Company's business.  Employee will not, either during or after the term of this employment, appropriate this asset to his own benefit.

(Dkt. No. 56-1, ¶ 2).

Count VI of Welsco's complaint alleges that Mr. Brace breached this provision by attempting to persuade Welsco employees to leave their employment with Welsco (Dkt. No. 4, ¶¶ 48-50).   In its summary judgment papers, Welsco claims that Mr. Brace violated this provision by obtaining sales from Welsco customers and damaging Welsco's good will with the 798 Union, as discussed in more detail below (Dkt. No. 57, at 13-14).   Mr. Brace argues that the covenant not to appropriate good will does not contain any restriction on soliciting employees and that Welsco never pleaded the separate claims of the appropriation of good will that Welsco now raises in its summary judgment papers.   More importantly, for purpose of challenging the validity of the noncompete agreement, Mr. Brace now contends that the covenant not to appropriate good will is overly broad for failing to include any time or geographical restriction.

This is an argument he did not make at the time the Court considered the preliminary injunction issue.

As an initial matter, the Court agrees with Mr. Brace that the covenant not to appropriate good will does not contain a restriction on soliciting Welsco employees. The Court further agrees that Welsco did not plead in its complaint the claims it now raises in its summary judgment papers alleging that Mr. Brace appropriated Welsco's good will with the 798 Union. Accordingly, the Court grants Mr. Brace's motion for summary judgment as to these claims.

As to Mr. Brace's challenges to the enforceability of the covenant not to appropriate good will, Welsco does not address Mr. Brace's argument on this issue. Rather, Welsco primarily relies on the Court's prior rulings on the noncompete without specifically discussing the covenant not to appropriate good will. However, the Court agrees with Mr. Brace that the Court did not expressly consider this provision in its prior rulings on the validity of the noncompete. The parties did not previously make arguments regarding this provision as a restriction on competition. The Court nonetheless rejects Mr. Brace's challenges to the covenant not to appropriate good will.

The Court acknowledges that paragraph two, the covenant not to appropriate good will, does not contain the geographic or duration limitations that are stated elsewhere in the noncompete agreement. It is unclear exactly what paragraph two purports to restrict in the context of an employment contract. The noncompete agreement already contains a specific covenant not to compete in paragraph three with specific limitations, as discussed above. The one year limitation is also provided in paragraph one pertaining to confidential information. In addition, paragraph four of the noncompete agreement appears to limit the scope of the entire noncompete agreement to one year after the termination of Mr. Brace's employment. "Different

clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible." *Cont'l Cas. Co. v. Davidson*, 463 S.W.2d 652, 655 (Ark. 1971). Reading all parts of the noncompete together and in harmony, the Court concludes that paragraph two is modified by the limitations stated in the other provisions of the noncompete agreement.

Mr. Brace makes a separate challenge that the covenant not to appropriate good will is impermissibly vague. This argument is not developed or supported with legal citations, and the Court finds no viable claim that Welsco has stated under this provision. Accordingly, the Court declines to consider this argument.

For these reasons and those stated in the Court's prior Opinion and Order, the Court finds that Arkansas law governs the noncompete agreement and that the noncompete agreement is valid and enforceable under Arkansas law.

## VI.    Analysis Of The Merits

The Court will next consider the parties' arguments on the merits of Welsco's claims, beginning with the claims for which Welsco seeks summary judgment.

### A.    Covenant Not To Work For Competitor

Both parties move for summary judgment on Welsco's claim in Count I of its complaint that Mr. Brace breached the covenant not to work for a competitor. The noncompete agreement provided that, during the term of his employment with Welsco and for one year afterward, Mr. Brace would "not participate in or assist, whether as employee, officer, director, shareholder, promoter, finder, agent, owner, partner, consultant, manager or otherwise in the promotion, organization or operation of any business or other endeavor in competition with the business of

[Welsco] in the counties in which [Mr. Brace] has engaged in business activities for [Welsco], during the last six (6) months of his employment with [Welsco]"  (Dkt. No. 56-1, ¶ 3).

It is undisputed that Mr. Brace worked in Tulsa County, Oklahoma, during the time he was employed by Welsco and that, upon his resignation from Welsco, went to work for Gas & Supply, a direct competitor of Welsco in Tulsa County, Oklahoma, and in other counties in which Mr. Brace engaged in business activities for Welsco during the last six months of his employment.  Based on this, Welsco moves for summary judgment on liability for breach of the covenant not to work for a competitor.  Mr. Brace does not contend that his acts do not constitute breach of the covenant not to work for a competitor.   On this claim, he relies solely on his argument that this anti-employment provision of the noncompete agreement is unenforceable (Dkt. No. 63, at 29; Dkt. No. 84, at 24-26).   The Court rejects this argument for the reasons previously stated at section V, *supra*.

Because Mr. Brace does not dispute that he went to work for a direct competitor of Welsco in the geographical area defined in the noncompete agreement, the Court finds that there is no genuine issue of material fact that Mr. Brace violated the noncompete agreement by becoming an employee of Welsco's competitor, Gas & Supply, during the noncompete period. The Court grants summary judgment in favor of Welsco on Count I of its complaint.   Mr. Brace's motion for summary judgment as to Count I is denied.

### B.   Soliciting Or Procuring Welsco's Customers

Both parties move for summary judgment on Welsco's claim in Count V of its complaint that Mr. Brace violated the agreement that he would not "solicit or procure any of [Welsco's] customers whom or which he had dealt with on behalf of [Welsco] in an effort to obtain or retain

their business other than on behalf of [Welsco]" for a period of one year following the end of his employment with Welsco (Dkt. No. 56-1, ¶ 3).

Welsco contends that Mr. Brace solicited and/or procured his former Welsco customers to obtain or retain this business for Gas & Supply based on the testimony that Mr. Brace set up a desk and advertised at the 798 Union Hall, continued using the same number that he used for conducting business for Welsco, and directed clients who called on that number to take specific actions to become Gas & Supply clients.  It is undisputed that members of the 798 Union and other former Welsco customers with whom Mr. Brace had done business continued to do business with him at Gas & Supply.

In support of his motion for summary judgment and in response to Welsco's motion for summary judgment, Mr. Brace contends he did not breach the noncompete agreement because he did not solicit these customers.  He argues that these customers became customers of his at Gas & Supply after requesting his services on their own initiative.  To this end, the parties dispute the proper interpretation of the contract.  Mr. Brace argues the noncompete agreement's use of "solicit" and "procure" can only be interpreted to prohibit "active solicitation" because the ordinary meaning of procure "connotes action."  (Dkt. No. 84, at 29).  Welsco argues that this interpretation is contrary to the plain language of the contract because the contract does not include the modifier "active" and because Mr. Brace attempts to give the same definition to both "solicit" and "procure."  Mr. Brace argues that, to the extent "procure" is ambiguous or has multiple meanings, it must be construed in his favor and against Welsco as the drafter of the noncompete agreement.

"Under Arkansas law, the determination whether a contract is ambiguous is a question of law." *Jet Asphalt & Rock Co., Inc. v. Angelo Iafrate Const., LLC,* 431 F.3d 613, 616 (8th Cir.

2005).  "Unambiguous contracts are construed as a matter of law, while the meanings of ambiguous contracts are determined by the finder of fact."  *Id.*  "When a contract is free of ambiguity, its construction and legal effect are questions of law for the court to determine, and it is the court's duty to construe the writing in accordance with the plain meaning of the language employed."  *Spann v. Lovett & Co., Ltd.*, 389 S.W.3d 77, 88 (Ark. Ct. App. 2012).  "Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one equally reasonable interpretation."  *Id.*  "Where the issue of ambiguity may be resolved by reviewing the language of the contract itself, it is the trial court's duty to make such a determination as a matter of law."  *Id.*"  Although ambiguities in a contract are to be construed against the drafter, "[t]he dominant rule is that interpretation of a contract is controlled by the intention of the parties."  *Les-Bil, Inc. v. Gen. Waterworks Corp.*, 511 S.W.2d 166, 170 (Ark. 1974).  "The rule that ambiguous language should be construed against the drafter . . . is subordinate to the primary rule that the intention of the parties be ascertained and effectuated."  Ark. Model Jury Instr., Civil AMI 2424, cmt.

The Court concludes that this language is not ambiguous.  The noncompete agreement prohibits both soliciting and procuring customers.  Black's Law Dictionary defines "solicit" as "[t]he act or an instance of requesting or seeking to obtain something; a request or petition."  Black's Law Dictionary (9th ed. 2009).  "Procurement" is defined, in part, as "[t]he act of getting or obtaining something or of bringing something about."  *Id.*  The Oxford English Dictionary defines "procure" in part to mean "to obtain; to bring about" and "to acquire or obtain, esp. with care or effort; to gain, get possession of (now the usual sense)."  OED Online (Sept. 2013).  Webster's defines "procure" to mean "to get possession of" or "obtain by particular care or effort."  Webster's Ninth New Collegiate Dictionary 983 (9th ed. 1986).  The Court will give

these terms their plain and ordinary meaning.  The Court rejects Mr. Brace's request to define "procure" as "active solicitation."  Defining "procure" as "active solicitation" is not a reasonable interpretation, especially given the contract's use of both "solicit" and "procure."

Applying the plain meanings of those terms, the Court agrees with Welsco that Mr. Brace has admitted actions that violate the prohibition on soliciting or procuring Welsco's customers with which Mr. Brace did business on Welsco's behalf.  Mr. Brace admits to taking action to obtain his former Welsco customers as customers for Gas & Supply by setting up a desk at the 798 Union, which by his own admission was to obtain sales, and by instructing Welsco clients how to become customers of Gas & Supply to continue doing business with him.  Accordingly, the Court finds that Mr. Brace has breached the noncompete agreement to the extent he admits obtaining Welsco customers during the noncompete period by directing them how to become his customers at Gas & Supply.

Next, Mr. Brace argues in his motion and his response to Welsco's motion that Welsco cannot show harm from his alleged solicitation and procurement of Welsco customers.  He contends that Welsco cannot show that any of the customers he allegedly solicited or procured would have done business with Welsco absent his continued employment there.  In support, he cites the declarations of Mr. Beddingfield and Mr. Hendrix and argues that all of the Welsco customers who followed him to Gas & Supply chose to purchase products from him based on their long-standing personal relationships with him that he developed years before he began employment with Welsco.  Mr. Brace essentially argues that he brought this business to Welsco and that his relationships with these customers were fully developed before he ever joined Welsco.  The Court is not persuaded by these arguments.  First, the record partially contradicts Mr. Beddingfield and Mr. Hendrix's assertions that they selected Mr. Brace as their salesman at

a time when, according to Mr. Brace's testimony, he was not involved in direct sales prior to joining Welsco, and it is not for the Court to resolve these conflicts.   Regardless, Mr. Beddingfield and Mr. Hendrix do not speak for every other Welsco customer.

Mr. Brace also claims that Welsco took no actions to attempt to maintain its relationships with the customers it lost or to determine why they left Welsco.  The Court disagrees.  Mr. Brace misstates Mr. Layton's testimony on this point.   Mr. Layton specifically testified that he attempted to reach out to the 798 Union, through his own visits or sending Welsco employees to make contact.   Although these visits were relatively few, the testimony suggests it became apparent relatively quickly that further efforts were futile after Welsco was no longer welcome at the 798 Union.  In addition, while Mr. Kohler testified that he did not consider alternative causes for the customers leaving Welsco, he explained that he did not believe there was any other plausible reason besides Mr. Brace's breach of the noncompete agreement.  Lastly, Mr. Brace himself contends that all the former Welsco customers who followed him did so based on their relationships with Mr. Brace.

The Court grants in part and denies in part summary judgment as to this claim.  The Court determines that, based on the language of the contract, Mr. Brace violated the terms of the noncompete.  The Court finds that there are disputed issues of fact whether, and to what extent, Welsco lost sales due to Mr. Brace's solicitation and procurement of former Welsco customers. The Court rejects Mr. Brace's argument that Welsco cannot show harm on this count.  The Court considers separately Mr. Brace's challenge as to Welsco's evidence of lost profits below.

### C.    Alleged Appropriation Of Good Will

Welsco next moves for summary judgment on its claim that Mr. Brace violated the noncompete agreement by appropriating for his own benefit Welsco's asset of good will.  The noncompete agreement stated that Mr. Brace agreed that the good will existing between Welsco,

33

its employee representatives, and its customers or clients was a unique and valuable asset of Welsco's business and prohibited Mr. Brace from appropriating this asset to his own benefit either during or after the term of his employment (Dkt. No. 56-1 ¶2).  Welsco argues that Mr. Brace appropriated Welsco's good will with its clients by:  (1) obtaining sales from Welsco customers by directing Welsco's customers who called the same phone number that Mr. Brace used to conduct Welsco business to take action so that they could do business with Gas & Supply, (2) interfering with and damaging Welsco's good will with the 798 Union by violating the non-compete agreement and requiring Welsco to bring litigation, and (3) interfering with and damaging Welsco's good will with the 798 Union by making derogatory comments about Welsco's intentions in its involvement with reporting the improper handling of client funds by Mr. Hobrock.

The parties first dispute whether Welsco pleaded a claim for appropriation of good will. Mr. Brace contends that Welsco has never pleaded a claim that he appropriated the good will between Welsco and its customers and that Welsco has failed to disclose damages for such a claim (Dkt. No. 84, at 35).  He argues that he would be prejudiced if Welsco is allowed now to seek summary judgment on this claim.  Welsco argues that it pleaded that good will was an asset and part of the protectable interest that is subjection to the restrictions in the noncompete agreement, it specifically mentions the good will clause in the body of its complaint, and it alleges in its complaint that Mr. Brace violated the noncompete agreement by soliciting or procuring its customers and employees (Dkt. No. 121, at 6-7).

The Court finds that, although Welsco mentioned the good will clause in the body of its complaint, Welsco did not plead in its complaint a breach of the covenant not to appropriate good will.  To the extent Welsco asserts this claim based on procuring sales and customers, such

a claim is redundant to Welsco's claim for breach of the covenant not to compete.  To the extent Welsco asserts an appropriation of its good will on other theories, the Court agrees with Mr. Brace that this is a new theory of liability that was not pleaded in Welsco's complaint.  The Court denies Welsco's motion for summary judgment on any claims that Mr. Brace violated the covenant not to appropriate good will, finding that Welsco has not pleaded such claims.

### D.    Evidence Of Lost Profits For Breach Of The Noncompete Agreement

Mr. Brace moves for summary judgment that Welsco has failed to show evidence of damages on its claim for breach of the noncompete agreement.  Damages recoverable from breach of contract are those damages that would place the injured party in the same position as if the contract had not been breached.  *First United Bank v. Phase II*, 69 S.W.3d 33, 46 (Ark. 2002).  Damages must arise from the wrongful acts of the breaching party.  *Dawson v. Temps Plus, Inc.*, 987 S.W.2d 722, 728 (Ark. 1999) (citing Arkansas Law on Damages § 4:5).  Consequential damages are those damages that do not flow directly and immediately from the breach, but only from some of the consequences or results of the breach.  *K.C. Properties of N.W. Arkansas, Inc. v. Lowell Inv. Partners, LLC*, 280 S.W.3d 1, 10 (Ark. 2008).  Lost profits are well recognized as a type of consequential damages.  *Id.*  In breach-of-contract cases, consequential damages are recoverable when they were fairly within the contemplation of the parties.  *Dawson*, 987 S.W.2d at 728.

Lost profits must be proven by evidence showing that it was reasonably certain the profits would have been made had the other party carried out its contract.  *Little Rock Wastewater Util. v. Larry Moyer Trucking, Inc.*, 902 S.W.2d 760, 766 (Ark. 1995).  The plaintiff "must present a reasonably complete set of figures, and not leave the jury to speculate as to whether there could have been any profits."  *Sumlin v. Woodson*, 199 S.W.2d 936, 939 (Ark. 1947).  However, less

certainty is required to prove the amount of lost profits than is required to show that profits were lost. *Spann v. Lovett & Co., Ltd.*, 389 S.W.3d 77, 91 (Ark. Ct. App. 2012). "Loss may be determined in any manner that is reasonable under the circumstances. *Spann*, 389 S.W.3d at 91. Proof of an established business's past profits is sufficient proof of its lost future profits. *Boellner v. Clinical Study Centers, LLC*, 378 S.W.3d 745, 756, *reh'g denied* (Ark. 2011). "Lost net profits, not lost gross profits, are recoverable." *Id.* Net profit is determined by deducting from gross income all of the applicable variable expenses, but not fixed overhead expenses. 1 Arkansas Law Of Damages § 5:3 (5th ed.) (citing *Interstate Oil & Supply Co. v. Troutman Oil Co.*, 972 S.W.2d 941 (Ark. 1998)). Variable expenses should be deducted to calculate net profits, but "fixed overhead expenses need not be deducted from gross income to arrive at the net profit properly recoverable." *Interstate Oil & Supply Co.*, 972 S.W.2d at 944.

Welsco seeks to recover lost profits on the sales it contends it would have made to customers during the noncompete period, as well as the profits that it claims would have been made on sales to those same customers had Mr. Brace not damaged those relationships. Welsco has presented a damages model prepared by Mr. Kohler. Mr. Kohler actually prepared two damages models, a first model based on Welsco's sales before and after Mr. Brace left Welsco and a second, updated model based on Gas & Supply's invoices for sales during the noncompete period to former Welsco customers to whom Mr. Brace testified he made sales (Dkt. No. 88-5, at 1-2).

Mr. Brace argues that Welsco's proof of damages fail as a matter of law based on his challenges to Mr. Kohler's damages model and testimony. Mr. Brace also has filed a separate motion to exclude Mr. Kohler's testimony on damages in which Mr. Brace makes arguments as to the admissibility of Mr. Kohler's testimony as an expert testimony (Dkt. No. 66). The Court

will decide that motion by separate order, but the Court notes that Welsco has designated Mr.

Kohler to give testimony on damages as Welsco's corporate officer, not as an expert witness.

The Court agrees with Welsco that Mr. Kohler is qualified to give lay opinion testimony on

damages pursuant to Federal Rule of Evidence 701. *See Allied Sys., Ltd. v. Teamsters Auto.*

*Transp. Chauffeurs, Demonstrators & Helpers, Local 604*, 304 F.3d 785, 792 (8th Cir. 2002)

(finding no abuse of discretion in admitting company officer's opinion testimony as to damages

under Rule 701); *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004-05 (8th Cir. 1986)

("Personal knowledge or perception acquired through review of records prepared in the ordinary

course of business, or perceptions based on industry experience, is a sufficient foundation for lay

opinion testimony."); *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 328 F. Supp. 2d 1029, 1039-40

(D.S.D. 2003) (company president was qualified to give lay opinion testimony on company's lost

profits, including 10-year damage projection), *aff'd*, 418 F.3d 820 (8th Cir. 2005).

Mr. Brace first challenges Mr. Kohler's damages model on the argument that Mr. Kohler

failed to calculate properly net profits.  Welsco does not claim it is entitled to lost gross profits.

Indeed, Mr. Kohler purports to calculate lost net profits.  Mr. Brace objects, however, to Mr.

Kohler's methodology in deducting the costs of products by using historical margins and

estimated average costs.  To discount costs, Mr. Kohler's updated damages model uses Welsco's

profit margins for the items sold, as if Welsco had made those sales in the last twelve months of

Mr. Brace's employment with Welsco because Gas & Supply's costs had not been produced at

that time (Dkt. No. 88-5, at 3-4).  In other words, the updated damages model uses Mr. Kohler's

estimate of Welsco's average costs for the customers listed for the last year of Mr. Brace's

employment with Welsco (Dkt. No. 62-11, at 6).  Mr. Kohler said that he did not use for his

damages calculations Welsco's actual costs for the products sold because Welsco's costs for the

products are the same as Gas & Supply's costs and because he believes using historical margins is a fair and reasonable method for his calculations (*Id*. at 9-10). The Court cannot say Mr. Kohler's methodology is fundamentally flawed on this basis. Whether Mr. Kohler's testimony is admitted as lay opinion testimony or as expert testimony, the reasonableness of his testimony is for the jury to decide. *Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1120-21 (8th Cir. 2006); *Diesel Mach., Inc.*, 328 F. Supp. 2d at 1040.

Mr. Brace also objects to Welsco's damages model in that it projects lost profits beyond the noncompete period. Mr. Brace argues that Welsco is not entitled to recover damages beyond the noncompete period as a matter of law. Mr. Brace further argues that, even if Welsco is entitled to recover damages which Mr. Brace disputes, Mr. Kohler's projections of those lost profits beyond the noncompete period are inadmissible.

Post-contract lost profits are a form of consequential damages and, as such, are recoverable if they were fairly within the contemplation of the parties. *Dawson*, 987 S.W.2d at 728. To recover consequential damages, Welsco must establish that Mr. Brace knew his breach of the noncompete agreement would cause more than ordinary damages and should have understood that he agreed to assume responsibility for the consequential damages. Ark. Model Jury Instr., Civil AMI 2443. "In determining the reasonable contemplation of the parties, it is proper to consider the nature and purpose of the contract and the attending circumstances known to the parties at the time the contract was executed." *Deck House, Inc. v. Link*, 249 S.W.3d 817, 826 (Ark. Ct. App. 2007). Mr. Brace argues that nothing in the noncompete agreement contemplated damages beyond the noncompete period. He relies on *Porous Media Corp. v. Midland Brake, Inc.*, 220 F.3d 954, 961-62 (8th Cir. 2000), in which the Eighth Circuit, applying Minnesota, law found that the parties did not contemplate post-contractual lost profits for breach

of a requirement contract that included a confidentiality agreement promising "not to cause others to manufacture" plaintiffs' product.  *Id.*  Significant to the reasoning of that case was the nature of the underlying requirement contract.  *Id.*  That case is not on point here.

Welsco disputes Mr. Brace's contention that the parties did not contemplate damages after the noncompete period, although Welsco does not clearly address this in its briefing, focusing instead on arguments as to its proof of damages (Dkt. No. 89, ¶ 51; Dkt. No. 88, at 17-20).  Nonetheless, it is apparent from Welsco's arguments that Welsco believes the noncompete agreement sought to protect customer relationships that, but for Mr. Brace's actions during the noncompete period, would have continued on for some years and lead to sales beyond the noncompete period.  Indeed, both parties have presented testimony and arguments relating to the importance of customer relationships in maintaining sales in this industry.   Drawing all reasonable inferences in Welsco's favor, the Court finds that Welsco has presented evidence from which a reasonable jury could find that the parties fairly contemplated lost profits beyond the noncompete period.

Mr. Brace also challenges Welsco's proof of post-contractual damages based on his objections to Mr. Kohler's assumptions and methodology.  He argues that Mr. Kohler merely speculates that the customers he claims Mr. Brace solicited would have continued to do business with Welsco until at least May 2017.  Welsco responds that Mr. Kohler is qualified to give opinion testimony on this issue because he has knowledge of Welsco's finances and business operations by virtue of his position as CFO and COO.  The Court agrees that, based on the record before it and for the reasons explained by the Court in this Order, Mr. Kohler may offer this testimony.

Viewing the record in the light most favorable to Welsco, the Court cannot say that Welsco has failed as a matter of law to present sufficient evidence of damages on its claim for breach of the noncompete agreement.  Accordingly, the Court denies Mr. Brace's motion for summary judgment on this issue.

### E.    Alleged Solicitation Of Employees

Welsco also asserts claims for breach of contract, breach of duty, and tortious interference arising out of Mr. Brace's alleged solicitation of Welsco employees.  Mr. Brace moves for summary judgment on these claims.  Welsco did not specifically move for summary judgment on these claims.

Count VI of Welsco's complaint alleges that Mr. Brace violated the noncompete agreement when he "attempted to persuade employees of Welsco to leave their employment" (Dkt. No. 4, ¶¶ 47-51).  Welsco bases its claim for breach of contract for soliciting employees in two provisions of the contract—paragraph 2, the covenant not to appropriate the good will between Welsco and its employee representatives, and paragraph 3(a), the covenant prohibiting Mr. Brace from "directly or indirectly . . . participat[ing] in or assist[ing] . . . in the promotion, organization or operation of any business or other endeavor in competition with the business of [Welsco]."  (Dkt. No. 88, at 10).

The parties dispute whether the contract prohibits soliciting employees.  As stated above, the Court construes paragraph 2 to protect customer good will, not good will between Welsco and its employees.  However, the Court agrees with Welsco that soliciting employees on behalf of Gas & Supply falls within paragraph 3's prohibition on participating in or assisting the business endeavor of a competitor.  There is evidence that supports Welsco's claim that Mr. Brace breached this provision.  Mr. Brace admits contacting Russell Walker and Cliff Edwards about coming to work at Gas & Supply during the noncompete period (Dkt. No. 88-2, at 6-7).

Mr. Brace next argues in support of his motion for summary judgment on this claim that Welsco cannot show harm because neither Mr. Walker nor Mr. Edwards left Welsco's employment to work for Gas & Supply.  Welsco in response asserts that it is entitled to nominal damages for breach.  The Court agrees.  "Nominal damages may be recovered for the bare infringement of a right, or for a breach of contract unaccompanied by any actual damage."  *W. Union Tel. Co. v. Aubrey*, 33 S.W. 1063, 1064 (Ark. 1896); s*ee also* Ark. Model Jury Instr., Civil AMI 2401, cmt. ("Under Arkansas law, actual damage caused by the breach is not an essential element of a claim for breach of contract because a plaintiff is entitled to recover nominal damages in the absence of proof of actual damages.").  Mr. Brace argues that, even if Welsco can recover nominal damages, it failed to plead specifically for nominal damages in its complaint and has not identified proof of nominal damages (Dkt. No. 120, at 17-18).  The Court does not agree.  Welsco pleaded it was harmed by each count of its complaint, and Mr. Brace's argument as to proof of damages ignores that nominal damages may be awarded in the absence of proof of actual damages.  Mr. Brace's motion for summary judgment as to Welsco's Count IV is denied.

Welsco also asserts in Count IX a claim for breach of fiduciary duty based on Mr. Brace's alleged solicitation of Welsco employees.  The Arkansas Supreme Court has held that a manager owes a fiduciary duty to his business.  *Pennington v. Harvest Foods*, *Inc.*, 934 S.W.2d 485, 495 (Ark. 1996).  Mr. Brace does not dispute that he owed a fiduciary duty to Welsco, but he contends that a manager only owes a fiduciary duty during his or her employment.  *See Vigoro Indus., Inc. v. Crisp*, 82 F.3d 785, 788 (8th Cir. 1996) (stating that absent contractual restrictions, corporate officers and directors under fiduciary duties to corporation are free to resign and go into competition, "so long as they remain loyal prior to resigning.").  He argues that Welsco has failed to present any evidence that he solicited Welsco employees while he was

still an employee at Welsco.   Mr. Brace, Mr. Edwards, and Mr. Walker offer conflicting testimony as to whether the conversations regarding employment at Gas & Supply occurred before or after Mr. Brace left Welsco's employment.   This dispute is material to this claim, as Welsco does not address Mr. Brace's argument that his fiduciary duty terminated at the end of his employment.   Accordingly, as to Welsco's breach of duty claim, there is a genuine issue of material fact regarding whether Mr. Brace solicited Welsco employees during the term of his employment with Welsco.

Mr. Brace argues again in regard to this claim that Welsco cannot show harm or damages from the alleged solicitation of Mr. Edwards and Mr. Walker.   However, as with the claim for breach of contract based on this alleged conduct, nominal damages are recoverable for tort actions.   *See* 1 Arkansas Law Of Damages § 3:2 (5th ed.) ("Other instances in which nominal damages have been deemed appropriate include . . . breach of fiduciary duty by an executor . . . .") (citing *Scarborough v. State*, 24 Ark. 20, 21 (1862)).   For these reasons, Mr. Brace's motion for summary judgment as to Welsco's Count IX is denied.

Welsco alleges in Count VIII of its complaint a claim for tortious interference with contract or business expectancy for allegedly soliciting Welsco employees for employment with Gas & Supply (Dkt. No. 4, ¶¶ 56-61).   Under Arkansas law, the elements of tortious interference are:  (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.   *Baptist Health v. Murphy*, 373 S.W.3d 269, 281 (Ark. 2010); *see Robertson Oil Co., Inc. v. Phillips Petroleum Co.*, 871 F.2d 1368, 1372 (8th Cir.1989); 1 Arkansas Law Of Damages § 33:15 (5th ed.).   To

prevail on this claim, a plaintiff "must allege and prove that a third person either did not enter into or failed to continue a contractual relationship with the claimant as a result of the unauthorized conduct of the defendant." *McNeill v. Sec. Ben. Life Ins. Co.*, 28 F.3d 891, 894 (8th Cir. 1994) (quoting *Navorro-Monzo v. Hughes*, 763 S.W.2d 635, 636 (Ark. 1989).

Mr. Brace argues that it is undisputed that the employees he allegedly solicited, Mr. Walker and Mr. Edwards, did not leave their employment with Welsco. Welsco does not address this argument but admits elsewhere that neither Mr. Walker nor Mr. Edwards terminated their employment with Welsco in response to Mr. Brace's alleged solicitation on behalf of Gas & Supply. Welsco's claim therefore fails on the essential element of breach or termination of the contractual relationship. The Court grants Mr. Brace's motion for summary judgment as to Welsco's claim in Count VIII for tortious interference based on Mr. Brace's allegedly soliciting employees.

### F. Alleged Use Or Disclosure Of Confidential Information

Welsco asserts four claims against Mr. Brace relating to his alleged improper use and disclosure of confidential information or trade secrets from Welsco (Dkt. No. 4, ¶¶ 28-31, 33-37, 40-41, 52-54). Count II of Welsco's complaint alleges breach of the covenant not to make use of or to divulge Welsco's confidential information. Count VII also alleges a breach of contract under the theory of inevitable disclosure of Welsco's confidential information through Mr. Brace's employment at Gas & Supply. Count III alleges a violation of the ATSA, Ark. Code Ann. §§ 4-75-601 *et seq*. Count IV alleges breach of fiduciary duty and duty of loyalty. Mr. Brace moves for summary judgment on these claims collectively.

Although the parties did not brief this issue, the Court notes that the ATSA "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret," although it does not affect "[c]ontractual or civil liability or

relief that is not based upon misappropriation of a trade secret." Ark. Code Ann. § 4-75-602(a).

Welsco's claim for breach of duty for wrongful disclosure and use of trade secrets is preempted

by the ATSA as this claim relies on the same acts alleged in Welsco's claim for misappropriation

of trade secrets. *See R.K. Enter., LLC v. Pro-Comp Mgmt., Inc*., 158 S.W.3d 685, 690 (Ark.

2004). Accordingly, the Court grants summary judgment in favor of Mr. Brace on Welsco's

claim in Count IV for breach of duty.

Turning to Welsco's claims under the ATSA and for breach of contract relating to

confidential information, Mr. Brace argues that Welsco fails to identify any protectable

information or trade secrets, admits there is no competent evidence of misappropriation, and has

not incurred and is not seeking damages on these claims. Welsco disputes each assertion.

### 1.     Protectable Information

Mr. Brace first argues that Welsco has failed to identify any protectable information. As

stated above, the noncompete agreement seeks to protect Welsco's confidential information that

includes its "lists of customers, their needs and requirements, and [Welsco's] business methods."

(Dkt. No. 56-1, ¶1). Welsco, in its briefing, also characterizes as its confidential information its

pricing information, including margins at which Welsco sold products; its costs; its contract

pricing list; its customer list; and Mr. Brace's "knowledge of and relationships with Welsco's

customers on behalf of Welsco." (Dkt. No. 88, at 11). As to Welsco's contractual claims, Mr.

Brace incorporates his arguments attacking the validity of the interests sought to be protected by

the noncompete agreement. The Court rejects these arguments for the reasons previously stated.

Turning to whether this information constitutes "trade secrets," the ATSA defines "trade

secret" as follows:

(4) "Trade secret" means information, including a formula, pattern, compilation,
program, device, method, technique, or process, that:

(A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ark. Code Ann. § 4-75-601(4).

The Arkansas Supreme Court has endorsed the following factors "as integral" in making the determination whether company information qualifies as a trade secret: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and to its competitors; (5) the amount of effort or money expended by the appellee in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *ConAgra, Inc. v. Tyson Foods, Inc.*, 30 S.W.3d 725, 729 (Ark. 2000).

Mr. Brace argues that the information Welsco seeks to protect does not qualify as a trade secret under these factors. The Court disagrees. "Customer lists and account information are secrets worthy of protection under the proper circumstances." *Bradshaw v. Alpha Packaging, Inc.*, 379 S.W.3d 536, 539 (Ark. Ct. App. 2010). "Customer lists obtained through use of a business effort, and the expenditure of time and money that are not readily ascertainable and are kept confidential, are given protection as a trade secret under the common law and the [ATSA]." *Freeman*, 281 S.W.3d at 756-57. Whether information allegedly used was written down or memorialized is immaterial to whether it is protectable as a trade secret. *Allen v. Johar, Inc.*, 823 S.W.2d 824, 827 (Ark. 1992). "Although confidential and valuable customer information that

would be costly and time consuming to duplicate qualifies for trade secret protection, readily ascertainable customer information does not." *Vigoro Indus., Inc. v. Crisp*, 82 F.3d 785, 790 (8th Cir. 1996). "This issue is fact intensive." *Id.*

The Court concludes that Welsco has presented sufficient evidence from which a reasonable juror could conclude that its customer information, including its margins, pricing information, and its related business methods, are considered confidential and would be of value to a competitor if not protected. Mr. Brace confirmed as much with his testimony at the preliminary injunction hearing that Welsco's client lists, which included pricing and cost information, would be considered confidential and would be of value to a competitor (Dkt. No. 38, at 106-07). Mr. Brace agreed that a person could use from memory at least some pricing and cost information to Welsco's detriment by undercutting Welsco's price to a particular customer (*Id.* at 107). He also agreed that Welsco's contract pricing list is an important document that would be valuable to a competitor, such that he understood the importance of it falling into the hands of a competitor (*Id.* at 81-82).

Welsco has demonstrated sufficient evidence from which a reasonable juror could conclude that it has taken reasonable steps to guard the secrecy of its customer and pricing information both within the company and without. Evidence in the record supports that Welsco requires employees to sign noncompete and confidentiality agreements, limits computer access to materials through passwords, and strictly controls the physical dissemination of hard copies of its contract pricing lists (Dkt. No. 38, at 28-29). *See Bradshaw v. Alpha Packaging, Inc.*, 379 S.W.3d 536, 540 (Ark. 2010) (finding reasonable efforts to protect customer and pricing information where company "used confidentiality agreements, computer passwords, document shredding, and other methods that restricted the flow of customer and pricing information both

within and outside the company."). In addition, by the plain terms of the noncompete agreement, Mr. Brace agreed that Welsco's customer lists, needs, requirements, and business methods constituted confidential information and a valuable, unique asset of the company. The Arkansas Supreme Court has "considered this a significant factor in determining whether information constitutes a trade secret." *Bradshaw*, 379 S.W.3d at 540 (citing *Saforo & Associates, Inc. v. Porocel Corp.*, 991 S.W.2d 117 (Ark. 1999); *Cardinal Freight Carriers*, 987 S.W.2d at 645).

The evidence also establishes that a reasonable juror could conclude that Welsco expended considerable business effort in developing the full extent of its customer information through the years of Mr. Brace's development of relationships with customers, notwithstanding Mr. Brace's arguments that the relationships pre-dated his employment with Welsco. Lastly, the steps Welsco takes to protect its information, combined with Mr. Brace's testimony acknowledging the sensitivity of the information and need to protect it, establishes that Welsco's customer and pricing information cannot be properly acquired or duplicated with ease.

Mr. Brace contends that customer information is readily accessible to the public because the needs of customers in the welding industry are easily ascertainable and are common knowledge within the industry. He argues, based on the testimony of Russell Walker, that customer identities and customer needs can be discovered "through word of mouth or just stopping by job sites" and that it is a simple task to research a customer an determine the type of machinery the customer will need based on the work the customer performs (Dkt. No. 63, at 40). Mr. Brace overstates this testimony, which at best establishes only limited, general knowledge as to competitors' customers and the needs of a prospective or new customer. Mr. Walker said that when out on "cold calls" to existing or prospective customers, the customers "sometimes" tell him the distributors they use, and he agreed that, after speaking to a new customer, he can

"generally figure out" what the customer's requirements will be and can "generally" determine a customer's needs based on the particular industry (Dkt. No. 62-10, at 6-10).   Welsco has identified customer information that goes beyond such general information.

Mr. Brace also argues that Welsco's pricing information is readily accessible to other distributors via the manufacturers' websites because the manufacturers' websites list prices to distributors and because some customers have special pricing at a set amount or mark-up that the distributors cannot alter.   Even if true, this argument only speaks to those customers who received special pricing, which appears to be a small segment of Welsco's customer.   Mr. Walker said only some customers get special pricing from the manufacturer, and as Mr. Brace himself argues, most customers had negotiated prices.   Beyond this, Mr. Brace again overstates Mr. Walker's testimony.   Mr. Walker said some customers receive special pricing and, in response to a separate line of questioning, he as a distributor has a code with which he can log into at least one manufacturer's website to view costs to Welsco (Dkt No. 62-10, at 11-13).   He did not say that any manufacturer's site lists special pricing information for customers who have special pricing agreements with the manufacturer.   The context of Mr. Walker's testimony suggests he was referring only to the manufactures' costs to the distributors.   Moreover, Mr. Walker admitted that he did not know whether the costs listed on the site were the costs for all distributors or were unique to Welsco (*Id.* at 11-13).

Further, the fact that some information regarding pricing and customer needs is generally known through the industry does not carry the day where Mr. Brace has conceded the confidential and valuable nature of Welsco's customer lists and related information.   For example, in *Cardinal Freight*, the court was not persuaded by testimony from defendant's witness, a consultant on the trucking industry, that "there are no meaningful secrets in the

trucking business" and that a trucking company's costs can generally be ascertained from legitimate sources and trade journals, where the consultant "conceded that the profitability of customer's account is information a company would like to keep confidential and would not want someone else to know."  987 S.W.2d at 646.

Mr. Brace also argues that Welsco's pricing information can be readily obtained through the customer and that Welsco admittedly takes no steps to prevent customers from sharing pricing information with Welsco's competitors.  Mr. Brace relies on *ConAgra v. Tyson Foods, Inc.*, 30 S.W.3d 725 (Ark. 2000), in which the court held that Tyson did not take reasonable measures to protect its pricing information in part because Tyson "neglected to include any restriction in its customer contracts which prevented disclosure to third parties." 30 S.W.3d at 729.  Mr. Brace's reliance on that case is misplaced.  He fails to consider the remainder of the court's reasoning that emphasized the lack of any protections against postemployment disclosure of confidential information, such as a covenant not to compete or separate confidentiality agreement with its executive employees, measures that were taken by the employer in *Cardinal Freight*.  In *ConAgra*, the court stated that it "took pains [in *Cardinal Freight*] to emphasize the reasonable steps that J.B. Hunt had taken to safeguard the profit-margin information and the marketing strategies from disclosure. . . .  No comparable protection to assure against postemployment disclosure of confidential information was instituted by Tyson."  *ConAgra*, 30 S.W.3d at 730 (citing *Cardinal Freight*, 987 S.W.2d at 646).  Here, Welsco has taken the same steps to protect against post-employment disclosure of confidential information that the Court emphasized in *Cardinal Freight*, 987 S.W.2d at 646.

In sum, the Court finds that Welsco has presented sufficient evidence from which a reasonable juror could conclude that it owned a trade secret under the ATSA.

## 2.    Alleged Misappropriation Of Confidential Information

Misappropriation is defined under the ATSA as a "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy . . . or [d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy." Ark. Code Ann. § 4–75–601(2)(B).    Similarly, Welsco's contract prohibits both the divulging or use of the identified confidential information (Dkt. No. 56-1, ¶ 1).

Mr. Brace argues that even if Welsco could prove the existence of protectable information and trade secrets, Welsco has admitted it does not have evidence that Mr. Brace actually used or disclosed any confidential information or trade secrets belonging to Welsco. Based on the preliminary injunction testimony, the Court understands Welsco's original allegations to involve both misappropriation of a hard-copy customer pricing list and misappropriation of confidential information from memory.  Mr. Brace argues that Welsco has no evidence that Mr. Brace took any confidential information other than the testimony that Welsco could not find the customer pricing list after Mr. Brace left.  Welsco does not respond to this argument and appears to proceed only on the theory that Mr. Brace used confidential information from memory.  On this allegation, the parties dispute whether Welsco may rely on circumstantial evidence and the "inevitable disclosure" doctrine.

The Arkansas Supreme Court expressly adopted the inevitable-disclosure rule in *Cardinal Freight Carriers* in the context of granting injunctive relief under the ATSA, recognizing that "[a] number of federal cases dealing with trade secrets have held that a plaintiff may prove a claim of trade-secret misappropriation by demonstrating that a defendant's new

employment will inevitably lead him to rely on the plaintiff's trade secrets." 987 S.W.2d at 646 (citing *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995);[2] *AMP, Inc. v. Fleischhacker*, 823 F.2d 1199 (7th Cir. 1987); *Teradyne, Inc. v. Clear Communications Corp.*, 707 F. Supp. 353 (N.D. Ill. 1989)).  In *Cardinal Freight*, the court found sufficient evidence of a threatened or inevitable misappropriation of J.B. Hunt's confidential information, including specific marketing strategies and price and customer information where its former employees in their new employment at Cardinal Freight were servicing the same customers they had serviced when they were employed by J.B. Hunt, Cardinal Freight's president approved of telling customers how Cardinal Freight was better than the competitor and comparing the companies' plans and capabilities, and Cardinal's employees expressed an intent to exploit holes in J.B. Hunt's software.  987 S.W.2d at 647.  On the other hand, "the mere fact a person assumes a similar position at a competitor does not, without more, make it inevitable that he will use or disclose trade secrets."  *Bendinger v. Marshalltown Trowell Co.*, 994 S.W.2d 468, 475 (Ark. 1999) (citing *AMP, Inc.*, 823 F.2d at 1202).  Likewise, the doctrine does not apply where the employee is using only general knowledge gained through his or her education and experience in the industry.  *Id.*

Mr. Brace argues in his motion that Welsco cannot rely on the inevitable disclosure doctrine because it relies on bare assertions.  Welsco contends that it has presented evidence for the application of the doctrine in that Mr. Brace is servicing the same customers he serviced at Welsco and Mr. Kohler's testimony that it was impossible for Mr. Brace to unlearn this

---

[2] Notably, in *PepsiCo*, the Seventh Circuit held that this logic was equally applicable to the threat of breach of a nondisclosure agreement.  54 F.3d at 1271 ("Because Redmond's position at Quaker would initially cause him to disclose trade secrets, it would necessarily force him to breach his agreement not to disclose confidential information acquired while employed in PCNA.").

information or not to use it with the customers he serviced at Welsco (Dkt. No. 88-4, at 7).  Mr.

Brace objects to Mr. Kohler's testimony in this regard; however, Mr. Brace also testified that he

remembered some customer, pricing, and cost information and agreed that one could use that

information to Welsco's detriment even without having the information in hard copy  (Dkt. No.

38, at 107).

Mr. Brace further argues in his reply that, beyond the nature of Welsco's evidence,

Welsco cannot rely on the inevitable disclosure doctrine as a matter of law to establish liability

(Dkt. No. 120, at 20-21).  He argues that the inevitable disclosure rule applies only in the context

of injunctive relief under the ATSA and not in the context of affirming claims for relief, citing

*NanoMech, Inc. v. Suresh*, No. 5:13-CV-05094, 2013 WL 4805692, at *5-6 (W.D. Ark. Sept. 9,

2013).  The Court disagrees.  In *NanoMech*, the court stated that it found no precedent for

applying the inevitable disclosure doctrine "to infer or impute potential losses in a breach-of-

contract action."  *Id*. at *6.  The court in *NanoMech* was not considering the doctrine's

applicability to the element of breach for the "use" or "disclosure" of confidential information.

This Court recognizes that the inevitable disclosure doctrine normally is applied in the

context of granting injunctive relief.  However, this Court on its own examination of the history

of the inevitable disclosure doctrine is not convinced that, to prove its claim for affirmative

relief, Welsco may not rely on the same type of circumstantial evidence it would rely on to

request injunctive relief.  "Direct evidence of theft of trade secret is rarely available and not

required in order to maintain the action.  Instead, a plaintiff may maintain an action for theft of

trade secrets based entirely on circumstantial evidence." *Sw. Energy Co. v. Eickenhorst*, 955 F.

Supp. 1078, 1085 (W.D. Ark. 1997) *aff'd*, 175 F.3d 1025 (8th Cir. 1999) (quoting *Pioneer Hi-

Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1239 (8th Cir. 1994)).  Moreover, Welsco

is not requesting that the Court grant relief based on its circumstantial evidence; it only relies on this evidence to reach the jury on its claims.  Drawing all reasonable inferences in Welsco's favor, the Court finds that Welsco has presented sufficient circumstantial evidence from which a reasonable jury could draw the inference that Mr. Brace misappropriated Welsco's confidential information.

### 3.    Damages

Lastly, Mr. Brace argues that Welsco has not presented evidence that it suffered any harm as a result of Mr. Brace's alleged misappropriation of confidential information.  Welsco's response on this issue is brief, but it appears to the Court that Welsco asserts as damages the sales it lost to Mr. Brace.  Because the Court finds that Welsco has presented sufficient evidence to reach the jury on the issue of use of the confidential information, the Court finds that there is also a genuine issue of material fact as to whether Welsco was harmed by and suffered compensable damages as a result of the alleged disclosure and use of the confidential information.

Accordingly, the Court denies Mr. Brace's motion as to Welsco's claims for breach of contract and violation of the ATSA for alleged use or disclosure of its confidential information.

*      *      *

Welsco's motion for summary judgment is granted in part and denied in part (Dkt. No. 56).  The Court grants Welsco's motion as to the issue of liability for Count I for breach of the covenant not to work for a competitor.  The Court denies Welsco's motion in all other respects. As to Welsco's Count V for breach of the covenant not to compete, the Court finds that, although Mr. Brace has admitted some actions that constitute breach, there are remaining issues of fact as to the extent of the breach and Welsco's alleged damages for Count V.

The Court grants in part and denies in part Mr. Brace's motion for summary judgment (Dkt. No. 62).   The Court grants Mr. Brace's motion as to Welsco's Count VIII for tortious interference based on the solicitation of Welsco employees and as to Welsco's Count IV for breach of duty for the wrongful disclosure and use of trade secrets, and those claims are dismissed with prejudice.   Mr. Brace's motion for summary judgment is denied in all other respects.

SO ORDERED this the 30th day of September, 2014.

_____
Kristine G. Baker
United States District Judge